Bruce MARKS; Kathy Steck, on behalf of the Voters of the Second District; Emanuel Lorenzo; Lydia Colon; Lillian Cruz; Diana Irizarry; Ruth Martinez; Zoraida Rodriguez; Yesenia Vasquez; Republican State Committee

v.

William STINSON; the William Stinson Campaign; Philadelphia County Board of Elections; Margaret M. Tartaglione; John F. Kane; Alexander Z. Talmadge, Jr. and various Doe and Roe Defendants.

Senator William Stinson, Appellant in No. 94–1247.

Philadelphia County Board of Elections, Margaret M. Tartaglione, John F. Kane and Alexander Talmadge, Jr., Appellants in No. 94–1248.

Ida Dougherty, Daniel J. Sears, Josephine Martin, Mary Martin, Joseph J. Jordan, Anne Jordan, Mary Sullivan, Mary Mendoloski, Anna Hagan and Robert W. Les, Intervenor–Appellants, as per the Court on 3/9/94, in Nos. 94–1247 and 94–1248.

Nos. 94–1247, 94–1248.

United States Court of Appeals, Third Circuit.

Argued March 10, 1994.

Decided March 16, 1994.

Washington, DC, for amici curiae Democratic Members of the Senate of Pennsylvania.

Before: STAPLETON, GREENBERG and COWEN, Circuit Judges.

Bruce S. Marks, pro se.

Paul R. Rosen (argued) and Jeffrey M. Goldstein, Spector Gadon & Rosen, P.C., Philadelphia, PA, for plaintiffs-appellees Kathy Steck, Manuel Lorenzo, Lydia Colon, Lillian Cruz, Diana Irizarry, Ruth Martinez, Zoraida Rodriguez, Yesenia Vasquez and Republican State Committee.

Arthur Makadon (argued), Charisse R. Lillie, Darryl J. May, Daniel Schoor–Rube, Robert R. Baron, Jr., Stephen J. Kastenberg, Ballard Spahr Andrews & Ingersoll; and Ralph J. Teti and Catherine L. Merino, Willig, Williams & Davidson, Philadelphia, PA, for appellant William Stinson.

Joseph A. Dworetzky, Acting City Sol., James B. Jordan (argued), Chair, Litigation Group and Marie C. Lasota, Asst. City Sol., City of Philadelphia Law Dept., Philadelphia, PA, for appellants Philadelphia County Bd. of Elections, Margaret Tartaglione, John F. Kane and Alexander Talmadge, Jr.

Richard A. Sprague (argued), Geoffrey R. Johnson and Denise Pallante, Sprague & Sprague, Philadelphia, PA, for intervenor-appellants.

Robert L. Byer, John P. Krill, Jr., Wendy E.D. Smith and Linda J. Shorey, Kirkpatrick & Lockhart, Harrisburg, PA, for amici curiae Republican Members of the Pennsylvania Senate.

Thomas A. Allen and Laura W. Brewer, White and Williams, Philadelphia, PA, for amicus curiae the Committee of Seventy (Frederick L. Voigt, Donald Beckman and Marsha I. Cohen, of counsel).

Edwin A. Abrahamsen, Lawrence J. Moran, William P. Conaboy, Abrahamsen Moran & Conaboy, P.C., Scranton, PA, and Mark A. Packman, Linda D. Feldmann and Teresa L. HarveyParedes, Dickstein, Shapiro & Morin,

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

After an evidentiary hearing on the plaintiffs' motion for a preliminary injunction, the district court in this case found that certain officials responsible for conducting an election in the second senatorial district of the Commonwealth of Pennsylvania had conspired with one of the two candidates to cause numerous illegally obtained absentee ballots to be cast. Based on that finding, the district court issued a preliminary injunction which enjoined the candidate who participated in the conspiracy from exercising any of the authority of the office of state senator and directed the board of elections to certify the result of the election based solely on the votes cast at the voting machines. The effect of the preliminary injunction was to require the decertification of the candidate previously declared to be the winner and the certification of his opponent.

In this appeal from the preliminary injunction, we are asked to declare that the district court abused its discretion by refusing to abstain and by fashioning an unreasonable interim remedy.

### I. INTRODUCTION

Republican Bruce Marks ("Marks") and Democrat William Stinson ("Stinson") ran in an election conducted on November 2, 1993, to represent Pennsylvania's second senatorial district. This election was held to fill the remaining portion of a term expiring in December 1994, and was of particular significance to both Republicans and Democrats because control of the Pennsylvania Senate was at stake. According to the certified results of the Philadelphia County Commissioners, sitting as the County Board of Elections ("the Board"),[1] of the 38,818 votes cast

---

1. In Philadelphia County, the Board is made up of two Democratic County Commissioners (Alexander Z. Talmadge, Jr., and Margaret M. Tartaglione) and one Republican County Commissioner (John F. Kane).

on the voting machines on election day, 19,-691 were cast for Marks, while 19,127 were cast for Stinson. However, of the 1,767 absentee ballots cast, Marks received only 371 votes, while Stinson received 1,396 votes. When all votes were added together, Stinson won by a final count of 20,523 to 20,062. The Board, therefore, certified Stinson as the winner of the election and he was subsequently sworn in as a Pennsylvania state senator.

Marks, the Republican State Committee, and eight named voters who reside in the second senatorial district (two of whom are residents who voted at the polling place in the election at issue, and six of whom are Latino residents of this same district who voted by absentee ballot) brought this suit alleging violations of the Voting Rights Act and the Civil Rights Act in connection with the election. The defendants are Stinson, the Stinson campaign, unnamed individuals who worked for the Stinson campaign, the Board, and Board members Margaret M. Tartaglione, John F. Kane, and Alexander Z. Talmadge, Jr. Defendants are joined as appellants by ten intervenors who are voters who legally cast absentee ballots and who allege that the preliminary injunction disenfranchised them.

Under Pennsylvania law, a qualified elector may vote by absentee ballot if he or she is, *inter alia*, absent from the Commonwealth or county of residence "because his duties, occupation or business require him to be elsewhere during the entire period the polls are open" or is physically unable to go to the polls. 25 P.S. § 3146.1(j) & (k). An elector who wishes to vote by absentee ballot must submit to the appropriate board of election an absentee ballot application, including a statement that the elector expects to be out of the county on election day or that the elector is physically unable to go to the polls, with a declaration stating the nature of the disability and the name, address, and telephone number of the attending physician. 25 P.S. § 3146.2(a) & (e)(1) & (e)(2). The absentee ballot application requires that the elector provide a "post office address to which [the] ballot is to be mailed." The deadline for the receipt of applications is 5:00

p.m. on the Tuesday before the election. 25 P.S. § 3146.2a.

Absentee ballots applications are processed by the local board of elections to determine if the applicant possesses all necessary qualifications. If the board is satisfied that the applicant is a qualified elector, the application is marked "approved." 25 P.S. § 3146.2b(a). If the board concludes that the applicant is not qualified, it must immediately notify the applicant. 25 P.S. § 3146.2b(d). After approving an absentee ballot application, the board of elections is required to "mail or deliver" an absentee ballot package to the elector at the address listed on the application. 25 P.S. § 3146.5. The absentee ballot package consists of an outer envelope in which is enclosed a declaration envelope, an inner envelope, and instructions. 25 P.S. § 3146.4.

The elector must mark the ballot "in secret," seal the ballot in the inner envelope, seal the inner envelope in the declaration envelope, and execute the declaration on the declaration envelope. 25 P.S. § 3146.6(a). An elector may legally receive assistance in filling out the absentee ballot only if the elector has a physical disability that "renders him unable to see or mark ... the ballot." 25 P.S. § 3146.6a. The elector must then "send by mail" or deliver "in person" the executed declaration package to the board of elections. 25 P.S. § 3146.6. To be valid, all absentee ballots must be received by 5:00 p.m. on the Friday before the election. 25 P.S. § 3146.6(a). If an elector who sent in an absentee ballot becomes able to get to the polls on election day, the absentee ballot is void as a matter of law, and the elector has a duty to go to the polls and void the ballot. 25 P.S. § 3146.6(b).

Election day pollwatchers for each candidate may challenge any absentee ballot at the polling place at the time the polls close. 25 P.S. § 3146.8(e). The unchallenged absentee ballots are canvassed after the polls close by opening the declaration envelopes, removing, mixing, and opening the sealed inner envelopes, and then counting the ballots. 25 P.S. § 3146.8. All challenges are heard by the county board of elections within seven days and the board's decision is ap-

pealable to the Court of Common Pleas. 25 P.S. § 3146.8(e).

## II. *THE DISTRICT COURT'S DECISION*

### A. *Findings of Fact*

Following a three-day hearing during which extensive testimony was presented, the district court issued detailed findings of fact which we now summarize.

The Stinson campaign sent its workers into divisions of the district where a majority of the residents were white to solicit voter registration applications and absentee ballot applications. The goal was to obtain twenty absentee ballot applications from each division. Those who expressed a hesitancy to register because they did not wish to go to a polling place were told by campaign workers that they could fill out an absentee ballot application and obtain an absentee ballot as a matter of convenience. Many improper applications were received based on this misrepresentation. These absentee ballot applications stated that the basis for voting absentee was that the applicant would be out of the county at the time of the election, despite the fact that the applicant had no reason to believe that this would be the case. To conceal the fact that many of these improper absentee ballot applications were solicited several months before election day, Stinson campaign workers told canvassers not to fill in the true date on the application. The absentee ballots that the Stinson campaign obtained in this way were then submitted directly to Commissioner Tartaglione's office and the corresponding absentee ballot packages were provided directly to the Stinson campaign. According to the testimony of one campaign worker, Stinson was aware of the improper conduct regarding the absentee ballots, yet he permitted the conduct to continue and even admonished campaign workers who questioned its legality.

About three weeks before the election, the Stinson campaign learned that a Democratic State Committee poll showed Marks running ahead of Stinson by four percentage points. The campaign responded by saturating the Hispanic and African–American areas of the district with absentee ballot applications using tactics similar to those earlier employed. This time, however, campaign workers solicited absentee ballot applications in person and by telephone by telling the Latino and African–American voters that there was a "new way to vote" from the convenience of one's own home. Campaign workers were paid $1.00 for each application or ballot that they were able to obtain in this way, and the campaign dispensed at least $500 to $700 dollars in this effort.

The Stinson campaign obtained approximately 1,000 absentee ballots applications from the minority sections of the district. The applications were then delivered by Stinson campaign workers directly to Commissioner Talmadge, and he provided the absentee ballot packages directly to the Stinson campaign. Stinson campaign workers then took the absentee ballots directly to applicants' homes. In numerous instances, Stinson workers executed applications, ballots, and declarations without the voter understanding the nature of the document. In other instances, Stinson workers instructed the voter to check certain places on the ballot, or filled out and forged the ballot. Voters were also assisted in completing applications and declaration packages after the statutory deadline for receipt by the Board had passed, and such ballots were counted by the Board. Many voters who cast absentee ballots testified that they were unaware that they had signed absentee ballot applications.

Almost 400 of the absentee ballot applications submitted by the Stinson campaign were rejected by the Board because they came from unregistered voters. These rejected applications were returned directly to Commissioner Talmadge, who then returned them to a Stinson campaign worker. Contrary to state law, no record was kept of the rejected applications.

Commissioners Tartaglione and Talmadge and Board employees working with them were aware of the absentee ballot campaign of Stinson and his workers and assisted that campaign by delivering hundreds of absentee ballot packages directly to Stinson workers rather than mailing or delivering them to the electors whose names and addresses ap-

peared on the applications. This assistance was designed to aid the Stinson campaign in obtaining more votes through personal contact between the electors and the Stinson campaign workers. No such assistance was provided to Marks or the Marks campaign. During regular office hours, employees of the Board mailed all absentee ballot packages to the voters whose applications they had approved. The Board's assistance to the Stinson campaign was covert and was not disclosed to Republican Commissioner Kane at the time.

## B. *Conclusions of Law*

After setting forth its factual findings, the district court concluded that the plaintiffs had established a likelihood of success on their claims. Specifically, the court found a likelihood of success on the claims that the defendants' conduct violated: "i. the First Amendment rights of Plaintiffs by illegally discriminating in favor of Democrat Stinson over Republican Marks.... ii. the equal protection rights of Plaintiffs by illegally discriminating in favor of Democrat Stinson over Republican Marks with no rational reason or purpose [, and] the substantive due process right of Plaintiffs to a free and fair election." The district court also found that a likelihood of success had been shown with respect to the plaintiffs' Voting Rights Act claims. Finally, the district court concluded that plaintiffs, "and even the entire state," suffer irreparable injury when an "improperly seated ... representative" of the people

exercises the powers of his office and when "constitutional freedoms" are lost.

Having determined that a preliminary injunction should be issued, the district court turned to the form of the interim relief to be granted. The court stated in part:

> In light of the massive scheme of Candidate Stinson and the Stinson Campaign, and in light of the failure of the Board to fairly conduct its duties, it would be grossly inequitable to allow Stinson to remain in office and for the Board to continue to conduct business as it did during the 1993 Election....
>
> The votes cast at the voting machines were not affected by the improper conduct of the Stinson Campaign or the Board, and no evidence indicates that the machine returns do not reflect the will of the electorate. The District should not be denied representation in the State Senate based on the efforts taken by the Stinson Campaign and the Board to conceal certain conduct relating to the absentee balloting procedures....
>
> The will of the electorate is reflected in the votes cast on the voting machines. The public interest will be served by having Marks, the candidate who prevailed on the undisputed legal votes, serve the remaining months of the term, which expires in December, 1994, rather than declaring the seat vacant and scheduling a new election at the May primary.

*Marks v. Stinson,* No. 93–6157, slip op. at 32–33, 1994 WL 47710 (E.D.Pa. Feb. 17, 1994).[2]

> [T]he County Board of Commissioners aided and abetted the Democratic Party in the facilitating of this fraud by making ... absentee ballots ... available in quantities in the hundreds, when the statute says that they should be mailed to the voter or delivered in person and they shall be received back by the voter in person....
>
> \* \* \* \* \* \*
>
> We will also produce for Your Honor on the same issue with respect to the abuse by the Democratic County Commissioners evidence that this was not a unique area.... We will produce evidence that the standard practice [was] hand[] delivery of a ballot to somebody, waiting while they vote and giving them literature, and that the facilitating of that problem was designed by the County Board of Commis-

2. Defendants Tartaglione and Talmadge maintain that they were without notice that preliminary injunctive relief against them was being sought in federal court. They point out that plaintiffs' motion for preliminary injunctive relief was directed solely to Stinson, as were the amended complaint and the pre-hearing memorandum. Notice, however, is required under Fed.R.Civ.P. 65(a), which provides: "No preliminary injunction shall be issued without notice to the adverse party." The order and findings of the district court therefore should be vacated, according to these defendants.

We disagree. At the preliminary injunction hearing on February 7, the plaintiffs' attorney made clear that plaintiffs would be attacking the Board's conduct and seeking injunctive relief against the Board:

## III. THE STATE PROCEEDINGS

The evidence and the factual findings of the district court clearly support its conclusion regarding the existence of irreparable injury and the likelihood of success on plaintiffs' Civil Rights Act claims, i.e., that the defendants operating under color of state law violated plaintiffs' rights under the First and Fourteenth Amendments.[3] As a result, the briefing and oral arguments in these appeals have focused primarily on defendants' contentions that the district court should have abstained and should not have granted the relief which it did. In order to understand the first of these issues, some knowledge of the state proceedings in this controversy is required.

On November 1, Marks appeared before Judge Gregory E. Smith of the Philadelphia County Court of Common Pleas with a Petition for Emergency Relief and Temporary Restraining Order. Marks requested that all absentee ballots in the district "be held impounded and deemed challenged" because "numerous voters were told they could vote by absentee ballots based on convenience." Stinson's lawyers opposed Marks' request and Judge Smith refused to hear Marks' evidence of fraud, instead referring the matter to the election day judge.

On election day, November 2, Marks appeared before Judge Edward J. Maier of the Philadelphia County Court of Common Pleas with a Petition for Emergency Relief. Stinson's lawyers opposed Marks' request, as did the Democratic City Committee and the Board, and Judge Maier refused to hear Marks' evidence of fraud. Judge Maier, however, retained jurisdiction. Also on election day, the Marks campaign attempted to challenge 551 absentee ballots at polling places in accordance with 25 P.S. § 3146.8(e), but 351 absentee ballots were opened in apparent violation of 25 P.S. § 3146.8(a).

On November 3, Judge Maier began to consider Marks' absentee ballot challenges in contravention of 25 P.S. § 3146.8(e) which provides that the Board is to hear initial challenges. Also represented before Judge Maier were Stinson, the Board, the Senate Republican Campaign Committee, the Democratic City Committee, and a public interest group known as the Committee of the Seventy. Judge Maier found that Marks' challenges to all but 11 absentee ballots were meritless and, on November 9, the Board proceeded to open the 200 challenged absentee ballots that had not yet been unsealed.

Marks and the Republican State Committee filed an emergency petition with the Pennsylvania Supreme Court on November 10 to stay further proceedings. The Supreme Court granted Marks' motion on November 13. On November 17, the Supreme Court ruled that Judge Maier lacked juris-

---

sioners in permitting the statute to be violated in that gross, unlawful manner.

The second issue is that the application to vote absentee is in English, English only.... [We will show that this is illegal] under the Voting Rights Act and the Civil Rights Act....

We will take the position that those acts and that surrounding what I talked to the Court about with respect to the facilitation of votes in the hands of a worker who's committed to get the vote for the client, is a discriminatory practice and *we will ask the Court to enjoin the County Board of Commissioners* from violating that practice in the future.... [W]e expect to be using Monday and Tuesday on the fraud issue and Wednesday and Thursday on wrapping up the issues with respect to the County Board of Commissioners.

App. 1075–78 (emphasis added). The counsel for the Board, in his remarks at the opening of the preliminary injunction hearing on February 7, acknowledged the plaintiffs' accusations and his intent to put forth a defense:

Our ... interest is in responding to the very scurrilous attacks directed ... at the Commissioners.... We will meet those challenges.... I am here to defend my clients. I cannot tell the Court how long that defense will take because we do not know what the plaintiffs' case will be. I will work with the Court to make our defense as concise as possible, but because of the nature of the attacks mounted against my clients, I owe them a full defense to meet these scurrilous charges.

App. 1087–89. Our review of the record has satisfied us that the members of the Board participated fully in the expedited discovery ordered by the district court and that all of the issues resolved by the court were litigated with the consent of all the parties, including the members of the Board.

3. Defendants vigorously deny that a likelihood of success has been demonstrated with respect to plaintiffs' Voting Rights Act claims. We have no occasion to reach that issue and express no opinion thereon.

diction over initial consideration of absentee ballot challenges under 25 P.S. § 3146.8(e). The matter was thus remanded to the Board.

On November 18, voters from the second senatorial district began an election contest pursuant to 25 P.S. § 3401. Also on November 18, the Board convened to consider Marks' challenge to the absentee ballots pursuant to 25 P.S. § 3146.8(e). Stinson, the Republican State Committee, and the Democratic City Committee, along with Marks, were represented before the Board. Marks attempted to present evidence of electoral fraud, but the Board heard from only one witness before determining that it could only consider testimony from authorized poll-watchers. None being present, the Board rejected all 551 challenges to the absentee ballots and certified Stinson as the winner.

The federal district court made the following finding of fact with respect to the Board's November 18th certification of Stinson:

99. On November 18, 1993, the Board certified Candidate Stinson as the winner of the election from the Second Senatorial District. However, this was done during the course of a public hearing prior to concluding the Board's findings of fact and conclusions of law. The decision to certify Stinson was made on November 18, 1993 when all other candidates for Election in the County of Philadelphia were certified on November 22, 1993.

100. The Board certified Stinson during the hearing even though Commissioner Talmadge knew that the Election Code provided two days to appeal a decision of the Board with respect to challenges and even though he knew Marks was going to appeal. Marks did appeal. 25 P.S. § 3146.8(e) requires the County Board to suspend any action in canvassing, computing, and certifying the winner pending the 48 hour period during which Marks had a right to appeal the City Commissioners' decision and 25 P.S. § 3157 requires the Board to suspend certification pending such appeal.

101. The actions of the Board were designed to, and did in fact, prevent any realistic opportunity to appeal the certification in the State court system. The Board applied the Election Code in a discriminatory manner designed to favor one candidate. Certifying Stinson in this manner would end inquiries into the election abuse in which Commissioners Tartaglione and Talmadge participated. The Board conducted nothing more than mock hearings and intentionally reached decisions that would not reveal their involvement in the ongoing absentee ballot voting scheme. . . .

The appeal and challenge structure is grounded in the rudimental supposition that the process is fair and not inherently flawed. The Stinson Campaign activities relating to the absentee ballots were improper. Nonetheless, this abuse should have been corrected by the Board. The improper actions of the Board deprived the plaintiffs from ever having their claims heard. Based on the Board's decision with reference to the challenges, the Board deprived the Court of Common Pleas of jurisdiction to consider plaintiffs' substantive claims. In short, the Board participated in an improper scheme and were then called upon to sit in judgment of that very conduct.

*Marks v. Stinson,* No. 93–6157, 1994 WL 47710 slip op. at 22–24 (E.D.Pa. Feb. 17, 1994).

On November 19, Marks and the Republican State Committee appealed the Board's dismissal of the absentee ballot challenge to Common Pleas Court. In addition, Marks filed an emergency petition with the Pennsylvania Supreme Court to request a stay to prevent Stinson from voting when the Pennsylvania Senate reconvened. The Pennsylvania Supreme Court refused to entertain a hearing or grant a stay.

On November 22, the Pennsylvania Senate reconvened. The President of the Senate, Lt. Gov. Mark S. Singel, a Democrat, ruled that Stinson was properly seated. Sen. Robert C. Jubelirer, a Republican, objected, claiming that the Board's certification of Stinson was invalid. The Senate voted 25–24 that Stinson was "eligible to vote on his own seating in the Senate," with Stinson casting the decisive vote. The Senate then voted 25–24 that Stinson was "properly seated as a member of the Pennsylvania Senate," with

Stinson again casting the decisive vote. *See Jubelirer v. Singel,* 638 A.2d 352 (1994) (*en banc*).

The appeal from the Board's dismissal of the absentee ballot challenge was heard on December 14 before Judge Mark I. Bernstein of the Philadelphia Court of Common Pleas. Marks and the Republican State Committee understood their appeal to be authorized under 25 P.S. § 3146.8 & § 3157 and attempted to present evidence of electoral fraud, but Judge Bernstein found that he could consider only what had been presented to the Board:

> [Marks and the Republican State Committee] ... ask[ ] the Court to assume plenary jurisdiction over any and all electoral abuses.... This the Court may not do. Jurisdiction is limited to reviewing the decisions of the County Board from which an appeal was taken; and if erroneously made, reversing those decisions.... [C]hallenges to absentee ballots must initially be presented to the County Board for determination. If their determination was proper, this Court has no jurisdiction to go further.

*In re General Election Contest Second Pennsylvania State Senatorial District,* Court of Common Pleas of Philadelphia County (Civ. Div., Nov. Term 1993, No. 2887, issued Jan. 10, 1994), slip op. at 12–13. Judge Bernstein accordingly affirmed the Board's certification of Stinson.

Judge Bernstein also was assigned the election contest being pursued under 25 P.S. § 3401. He ruled that the voters were required to post a $50,000 bond under 25 P.S. § 3459. The bond was not raised and, on January 10, Judge Bernstein dismissed the contest without providing a hearing on the merits. With respect to election contest petitioners Steck and Lorenzo, the district court found that they "were not given a 'realistic opportunity to fully and fairly litigate' constitutional claims in state court if they were required to post a $50,000 bond to proceed."

*Marks v. Stinson,* No. 93–6157, slip op. at 4, 1994 WL 37722 (E.D.Pa. Feb. 7, 1994).

Marks and the Republican State Committee have appealed Judge Bernstein's dismissal of the absentee ballot challenge to the Pennsylvania Supreme Court. That appeal is currently pending. Marks has appealed the dismissal of the election contest to the Pennsylvania Senate which has scheduled no proceedings thereon.[4]

### IV. *ABSTENTION*

■ "[F]ederal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred." *New Orleans Pub. Serv., Inc. v. New Orleans,* 491 U.S. 350, 358, 109 S.Ct. 2506, 2512, 105 L.Ed.2d 298 (1989). "Underlying [this] assertion[ ] is the undisputed constitutional principle that Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds." *Id.* (*citing Kline v. Burke Constr. Co.,* 260 U.S. 226, 234, 43 S.Ct. 79, 82, 67 L.Ed. 226 (1922)). "However, because federal courts do have discretion in determining whether to grant certain types of *relief,* abstention is appropriate in a few carefully defined situations." *Gwynedd Properties, Inc. v. Lower Gwynedd Township,* 970 F.2d 1195, 1199 (3d Cir.1992). "Thus, there are some classes of cases in which the withholding of authorized equitable relief because of undue interference with state proceedings is 'the normal thing to do.' " *New Orleans Pub. Serv.,* 491 U.S. at 359, 109 S.Ct. at 2513 (*quoting Younger v. Harris,* 401 U.S. 37, 45, 91 S.Ct. 746, 751, 27 L.Ed.2d 669 (1971)). Abstention, nevertheless, is the exception and not the rule. "[T]he federal courts' obligation to adjudicate claims within their jurisdiction [is] 'virtually unflagging.' " *Id.* (citing *Deakins v. Monaghan,* 484 U.S. 193, 203, 108 S.Ct. 523, 530, 98 L.Ed.2d 529 (1988)).

In *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court held that federal courts should abstain from enjoining state criminal prosecutions absent extraordinary circumstances. The

---

4. Under Pennsylvania law, only the candidate has standing to appeal an election contest to the legislature. *See* 25 P.S. § 3407.

Supreme Court has since expanded the reach of *Younger* to noncriminal judicial proceedings in which important state interests are involved. *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982). *Younger* abstention "reflects a strong federal policy against federal-court interference with pending state judicial proceedings." *Id.* at 431, 102 S.Ct. at 2521.

■ Although *Younger* abstention is founded on notions of comity, "the [mere] pendency of an action in state court is no bar to proceedings concerning the same subject matter in the Federal court having jurisdiction." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). "The presence of two parallel suits ... does not run afoul of *Younger.*" *Schall v. Joyce,* 885 F.2d 101, 112 (3d Cir.1989). This is true even in cases where there exists a "potential for conflict in the results of adjudications." *Colorado River,* 424 U.S. at 816, 96 S.Ct. at 1245; *Moses H. Cone Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). A federal court will only consider *Younger* abstention when the requested equitable relief would constitute federal interference in state judicial or quasi-judicial proceedings. *Middlesex,* 457 U.S. at 431, 102 S.Ct. at 2520–21; *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 599–600, 95 S.Ct. 1200, 1205–1206, 43 L.Ed.2d 482 (1975). Thus, while a proponent of abstention must show (1) there are ongoing state proceedings involving the would-be federal plaintiffs that are judicial in nature, (2) the state proceedings implicate important state interests, and (3) the state proceedings afford an adequate opportunity to raise the federal claims, *Middlesex County,* 457 U.S. at 432, 102 S.Ct. at 2521, such a showing does not require that the federal court abstain. "[W]here federal proceedings parallel but do not interfere with the state proceedings, the principles of comity underlying *Younger* abstention are not implicated." *Gwynedd Properties,* 970 F.2d at 1201.[5]

■ Before proceeding to the facts of this case, it is also important to recognize that a person with a federal Civil Rights Act claim has no duty to exhaust state remedies before pursuing his or her claim in the federal courts. *Patsy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). *Younger* principles must be applied in a manner consistent with this well-established proposition. As we noted in *Monaghan v. Deakins,* 798 F.2d 632, 638 (3d Cir. 1986), *aff'd in part and vacated in part,* 484 U.S. 193, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988), "in no case has the Supreme Court or this court ever turned the propriety of a *Younger* dismissal upon the mere availability of a state judicial proceeding." Thus, the plaintiffs in this proceeding could have proceeded in federal court without having resorted to the state's judicial process.[6] In the

**5.** Even if the equitable relief asked of the federal court would involve intervention in an ongoing state proceeding, the court must not abstain "if the state proceedings are being undertaken in bad faith, or if there are other extraordinary circumstances such as where the state proceedings are based on a flagrantly unconstitutional statute." *Gwynedd Properties,* 970 F.2d at 1200 (citation omitted). Neither of these circumstances exists here.

**6.** Other forms of abstention may require a would-be federal plaintiff to seek relief in the state system. *See Grode v. Mutual Fire, Marine & Inland Ins. Co.,* 8 F.3d 953 (3d Cir.1993) (reviewing *Burford* abstention, *Pullman* abstention, and *Colorado River* abstention). Defendants raise only one of those doctrines here, arguing that the district court should have abstained under *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). We note

initially that defendants did not ask the district court to abstain under *Pullman* and raised the issue for the first time on appeal. Moreover, *Pullman* abstention would have been inappropriate here.

The *Pullman* doctrine provides that "when a federal court is presented with both a federal constitutional issue and an unsettled issue of state law whose resolution might narrow or eliminate the federal constitutional question, abstention may be justified under principles of comity in order to avoid needless friction with state policies." *Chez Sez III Corp. v. Township of Union,* 945 F.2d 628, 631 (3d Cir.1991) (internal quotations and citations omitted), *cert. denied,* — U.S. ——, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992).

Defendants insist that it is uncertain whether Pennsylvania election law allows an election board to permit campaign workers to deliver absentee ballots to voters. Defendants also ar-

absence of a showing of some potential for interference with an ongoing state proceeding, *Younger* principles do not bar a Civil Rights Act plaintiff from going forward in a federal forum simply because there are unexhausted possibilities for state litigation over the same subject matter.

This principle is equally applicable where the plaintiff previously has been involved in state proceedings. Every state has a process for enforcing merits judgments entered by its courts and that process is, of course, an integral part of the state's judicial process for *Younger* purposes. *Younger* thus bars a federal plaintiff from securing relief against the enforcement of an adverse judgment against him on the merits. *See, e.g., Huffman,* 420 U.S. at 592, 95 S.Ct. at 1200 (*Younger* abstention appropriate where plaintiff sought injunctive relief in federal court rather than appealing state trial court judgment within the state system); *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (abstention under *Younger* required where plaintiff requested an injunction enjoining the execution of a state judgment). Such relief would constitute a direct intervention of the federal court in the state judicial process and the federal plaintiff can proceed in federal court in such a situation, if at all, only after securing a reversal of the judgment in the state courts.

■ This does not mean, however, that failure to exhaust state appellate remedies will always bar access to the federal courts under *Younger.* Exhaustion of appellate remedies is required by *Younger* only when the federal proceedings seek effectively to annul the state judgment. In *Wooley v.*

*Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), the Supreme Court distinguished *Huffman* on precisely this basis. The federal plaintiff there sought prospective relief against an allegedly unconstitutional statute under which he had been convicted. The federal defendants urged that *Younger* was applicable because the plaintiff had not appealed his conviction. The Court observed:

> Appellants, however, point out that Maynard failed to seek review of his criminal convictions and cite *Huffman v. Pursue, Ltd., supra,* for the propositions that "a necessary concomitant of *Younger* is that a party in appellee's posture must exhaust his state appellate remedies before seeking relief in the District Court," 420 U.S. at 608 [95 S.Ct. at 1210], and that "*Younger* standards must be met to justify federal intervention in a state judicial proceeding as to which a losing litigant has not exhausted his state appellate remedies," *id.,* at 609 [95 S.Ct. at 1211]. *Huffman,* however, is inapposite. There the appellee was seeking to prevent, by means of federal intervention, enforcement of a state-court judgment declaring its theater a nuisance. We held that appellee's failure to exhaust its state appeals barred federal intervention under the principles of *Younger:* "Federal post-trial intervention, in a fashion designed to annul the results of a state trial ... deprives the States of a function which quite legitimately is left to them, that of overseeing trial court dispositions of constitutional issues which arise in civil litigation over which they have jurisdiction." *Ibid.*

gue that it is uncertain whether an election board must wait two days after rejecting absentee ballot challenges before certifying a winner in order to permit an appeal. Abstention therefore would be appropriate, according to defendants, because "a definitive state court ruling on the election laws would narrow the scope of the constitutional issues now before the Court." Stinson Brief 31. We disagree. While the phrase "mail or deliver" in 25 P.S. § 3146.5 may be ambiguous as applied in some contexts, we are confident that the Pennsylvania courts would not construe it as authorizing an election board to give ballots to a candidate for delivery to voters, much less to one candidate and not his or her opponent. With respect to the waiting period, we find 25 P.S.

§§ 3146.8 and 3157 neither ambiguous nor material to the federal issues presented in this case. As the Supreme Court has noted:

> [*Pullman* abstention] contemplates that deference to state court adjudication only be made where the issue of state law is uncertain. If the state statute in question, although never interpreted by a state tribunal, is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question, it is the duty of the federal court to exercise its properly invoked jurisdiction.

*Harman v. Forssenius,* 380 U.S. 528, 535, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965) (citations omitted).

Here, however, the suit is in no way "designed to annul the results of a state trial" since the relief sought is wholly prospective, to preclude further prosecution under a statute alleged to violate appellees' constitutional rights.

*Wooley,* 430 U.S. at 710–11, 97 S.Ct. at 1433.

This is not a case in which the federal plaintiffs [7] are seeking relief which will in any way impair the ability of the state courts of Pennsylvania to adjudicate anything that is currently before them. When this suit was filed, plaintiffs Marks, Steck, and Lorenzo had instituted two proceedings challenging the election, both of which were then before the Court of Common Pleas. The federal suit did not directly or indirectly ask the court for any relief with respect to those state proceedings. The plaintiffs were simply pursuing parallel tracks seeking consistent relief in the federal and state systems.

In retrospect, plaintiffs' decision to pursue parallel tracks seems to have been a prudent strategy. By the time the district court was asked to abstain on *Younger* grounds and to decline to entertain plaintiffs' motion for a preliminary injunction, the Court of Common Pleas had refused in both proceedings before it to hear the evidence upon which plaintiffs' federal claims are based. In one instance, the court held that its jurisdiction was limited to the scope of the review the Election Board chose to conduct. In the other, it held that it could not go forward unless the plain-

tiffs posted a $50,000 bond. In the meantime, Stinson had been certified as the winning candidate, had been seated as a member of the State Senate based on his own vote, and had been exercising the prerogatives of that office for three months, a substantial portion of the term for which he was elected. With four months having passed without even a hearing in the state court at which they could present their evidence, the federal plaintiffs understandably turned to the federal court for relief. The interim relief they sought, once again, did not involve any restraint, direct or indirect, on the state's judicial process.

It is true, as defendants stress, that when the district court declined to abstain, one appeal was pending in the Supreme Court of Pennsylvania and another appeal, Marks' appeal in the election contest proceeding, was pending in the State Senate. As we have explained, however, *Younger* does not require federal plaintiffs to exhaust their appellate remedies unless the relief being sought from the federal court involves disruption of the state's judicial process. Insofar as *Younger* is concerned, the passage of time here has only served to cast doubt on the adequacy, for these plaintiffs at least, of any remedy the Pennsylvania Supreme Court may find to be available in the Court of Common Pleas.[8] The situation remains the same for *Younger* purposes as it was at the time of the filing of the federal complaint; the plaintiffs are still

7. Throughout this section, we refer to the federal plaintiffs collectively. Our doing so does not reflect a rejection of their substantial arguments that they should each be regarded as separate entities for *Younger* purposes. The plaintiffs who describe themselves as "Latino plaintiffs" have been a party to *no* state proceeding. Plaintiffs Steck and Lorenzo were denied access to the only proceeding they sought to join when they failed to post a $50,000 bond and they had no right to appeal from that denial. It is only Marks and the Republican State Committee who are currently parties to any state proceeding. The plaintiffs other than Marks argue that they are entitled to go forward, even if Marks cannot. The defendants, on the other hand, insist that abstention is appropriate as to all plaintiffs under *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). The Supreme Court there recognized that there are "some circumstances in which legally distinct parties are so closely related that they should be subject to *Younger* considerations which govern any one of

them." *Id.* at 928–29, 95 S.Ct. at 2566. This court has never had occasion to rule on whether voters and the candidate of their choice are such "closely related" parties and we decline to do so here. Since we conclude that Marks may go forward, we reserve that decision for another day.

8. Since plaintiffs' evidence has not been heard by a state court, the appeal in the Supreme Court of Pennsylvania appears to offer plaintiffs only the hope of securing a ruling that the Court of Common Pleas did have jurisdiction to hear their complaint. At the time the district court declined to abstain, the Supreme Court had not noted probable jurisdiction or set a briefing schedule. While it has since done so, the most that can be expected after the appeal is fully litigated is a pass back to square one—the Court of Common Pleas and an evidentiary hearing in which their claims can be pursued.

doing nothing more than pursuing a parallel track and the relief that they have sought and received does not in any way interfere with the judicial process of the state. This is true even if one assumes, as we do solely for the purposes of this opinion, that the election contest in the Senate should be regarded as a judicial proceeding for *Younger* purposes. The plaintiffs have asked only that Stinson be decertified and that Marks be certified by the Board. The certification of Marks would not preclude an election contest in the Senate, any more than the prior certification of Stinson precluded one.[9]

We believe our observations in *Kentucky West Virginia Gas Co. v. Pennsylvania Pub. Util. Comm'n*, 791 F.2d 1111, 1117 (3d Cir. 1986), are equally pertinent here:

"In the typical *Younger* case, the federal plaintiff is a defendant in ongoing or threatened state court proceedings seeking to enjoin continuation of those state proceedings." *Crawley v. Hamilton County Comm'rs*, 744 F.2d 28, 30 (6th Cir.1984). In this case, on the other hand, the federal plaintiffs—Kentucky West and Equitable Gas—are also the state plaintiffs. Moreover, they are not seeking to enjoin any state judicial proceeding; instead, they simply desire to litigate what is admittedly a federal question in federal court, having agreed to dismiss their pending state appeal if the district court assumes jurisdiction over the merits of their complaint. . . .

Under the circumstances, then, we believe that the balance of state and federal interests tips decidedly away from absten-

tion under *Younger*. *New Jersey Educ. Ass'n [v. Burke]*, 579 F.2d [764] at 771–72 [ (3d Cir.1978) ]. As a result, the district court abused its discretion when it dismissed the companies' complaint on this basis. To deny Kentucky West and Equitable Gas access to a federal forum simply because of their pending state appeal would be at odds with a fundamental premise of our federal judicial system: that is, "that where Congress has granted concurrent jurisdiction, a plaintiff is free to bring suit in both the state and federal forums for the same cause of action." *Id.* at 769.

While the federal plaintiffs in our case have not, so far as we are aware, agreed to abandon their state proceedings if the district court grants them relief, that is not essential to the principle articulated in *Kentucky West Virginia Gas*. A federal plaintiff may pursue parallel actions in the state and federal courts so long as the plaintiff does not seek relief in the federal court that would interfere with the state judicial process. Moreover, since parallel proceedings always involve a likelihood that a final merits judgment in one will effectively terminate the other, it necessarily follows that the mere fact that a judgment in the federal suit might have collateral effects in the state proceeding is not interference for *Younger* purposes.[10] *See, e.g., Gwynedd Properties, Inc. v. Lower Gwynedd Township*, 970 F.2d 1195, 1200–1203 (3d Cir.1992).

 The district court did not err in refusing to abstain.[11]

---

**9.** By so noting, we do not suggest that a federal court would be without power to enjoin an election contest in the Senate upon finding a violation of the Voting Rights Act or the Civil Rights Act, or that the Senate would not be required to give full faith and credit to a final district court judgment in this case. Those issues are not before us and we express no opinion thereon.

**10.** The defendants have not asserted before us that there is a final judgment of the Court of Common Pleas that bars the federal plaintiffs from going forward here on their Voting Rights Act and Civil Rights Act claims. *See* Wright, Miller & Cooper, *Federal Practice* § 4435 (a final judgment "on the merits" is a necessary predicate for claim and issue preclusion).

**11.** The defendants also urge that the district court lacked jurisdiction under the *Rooker–Feldman* doctrine. The district court rejected this argument, finding that *Rooker–Feldman* did not bar it from hearing the fraud and constitutional claims of any of the parties involved. The *Rooker–Feldman* doctrine embodies the principles set forth by the Supreme Court in *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), and *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923): "lower federal courts lack subject matter jurisdiction to engage in appellate review of state court determinations or to evaluate constitutional claims that are 'inextricably intertwined with the state court's [decision] in a judicial proceeding.'" *Port Auth. PBA v. Port Auth. of N.Y. & N.J.*, 973 F.2d 169, 177 (3d Cir.1992) (citing *Feldman*, 460 U.S. at

## V. *REMEDY*

■ Having concluded that the district court properly exercised its jurisdiction and that the record supports its findings on the probability of success and irreparable injury, we now turn to the remedy issue. The state elections process recognized Stinson as the winner of the election. While the district court found for purposes of plaintiffs' preliminary injunction motion that wrongdoing affected the election, it did not find, even for that limited purpose, that Stinson's election was attributable to wrongdoing. The district court did not find that Stinson failed to receive a plurality of the legally cast votes.

On the other hand, contrary to plaintiffs' strenuously pressed argument,[12] we do not understand the district court to have concluded that Marks received a plurality of the legally cast ballots. Nor did the district court address the problem created by the fact that some electors who cast tainted absentee ballots undoubtedly would have cast valid votes at the polls had they not been misled (by a conspiracy knowingly supported by state actors) into believing there was a "new way to vote." Thus, while the district court concluded that "no evidence indicates that the machine returns do not reflect the will of the electorate," slip op. at 32, it did not affirmatively conclude that the winner of the machine vote would have won a plurality of the legal votes cast if the wrongdoing had not occurred.

The district court did conclude, with ample record support, that the wrongdoing was substantial, that it *could* have affected the outcome of the election, and that it rendered the certified vote count an unreliable indicator of the will of the electorate. Having so concluded for the purposes of the preliminary injunction motion, we cannot say that the district court abused its discretion in

---

483 n. 16, 103 S.Ct. at 1315–16 n. 16). We agree with the district court that *Rooker–Feldman* principles are not applicable here.

First, *Rooker–Feldman* did not bar the district court from hearing the claims of the Latino plaintiffs because they were not parties to any of the state court proceedings on the matter. *Valenti v. Mitchell*, 962 F.2d 288, 297 (3d Cir.1992) ("[T]he *Rooker–Feldman* doctrine has a close affinity to the principles embodied in the legal concepts of claim and issue preclusion.... The basic premise of preclusion is that non-parties to a prior action are not bound. A non-party is not precluded from relitigating matters decided in a prior action simply because it passed by an opportunity to intervene.").

Second, the court was not barred under *Rooker–Feldman* from hearing the constitutional and fraud claims of Marks and the Republican State Committee ("RSC") because these claims had not been determined by the state court, nor were they inextricably intertwined with a prior state court decision. Specifically, the court of common pleas dismissed Marks' and the RSC's claims without reaching the merits. Therefore, the district court was not faced with a situation where it was asked to review a determination of the state court. Furthermore, a "federal claim is inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it. Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state court judgment." *Centifanti v. Nix*, 865 F.2d 1422, 1430 (3d Cir.1989) (quoting *Pennzoil Co. v. Texa-*

*co, Inc.*, 481 U.S. 1, 25, 107 S.Ct. 1519, 1533, 95 L.Ed.2d 1 (1987) (concurring opinion)). Here, the district court could (and did) find that Marks' and the RSC's fraud and constitutional claims had merit without also finding that the court of common pleas erred when it dismissed their proceedings. *Id.*

Finally, *Rooker–Feldman* did not bar the district court from hearing the claims of plaintiffs Steck and Lorenzo, the Election Contest petitioners. Because the court of common pleas did not reach the merits of their claims, the district court did not sit in review when it heard them. Nor are the claims of Steck and Lorenzo inextricably intertwined with the state court's decision to dismiss because the district court need not reverse this decision before granting Steck and Lorenzo federal relief.

**12.** At oral argument, plaintiffs insisted that the district court implicitly had found that Marks won a plurality of votes cast legally both at the polls and through absentee ballots. Central to plaintiffs' contention was the $685 that the Stinson campaign supposedly spent in furtherance of the absentee ballot fraud. *See* App. 5186–98. Each dollar, say plaintiffs, represented one vote, and when 685 votes are subtracted from Stinson's total, Marks prevails. The district court, however, found that the money was spent soliciting both applications for absentee ballots *and* absentee ballots, with $1 being paid "per application *or* ballot." *Marks v. Stinson*, No. 93–6157, 1994 WL 47710 (E.D.Pa. Feb. 17, 1994), slip op. at 16 (emphasis added). No conclusion thus can be drawn about how many votes were obtained from the expending of $685.

restraining Stinson from exercising the powers of the office *pendente lite.*

The integrity of the election process lies at the heart of any republic. The people, the ultimate source of governmental power, delegate to their elected representatives the authority to take measures which affect their welfare in a multitude of important ways. When a representative exercises that authority under circumstances where the electors have no assurance that he or she was the choice of the plurality of the electors, the legitimacy of the governmental actions taken is suspect. Accordingly, where there is substantial wrongdoing in an election, the effects of which are not capable of quantification but which render the apparent result an unreliable indicium of the will of the electorate, courts have frequently declined to allow the apparent winner to exercise the delegated power. *See, e.g., Bell v. Southwell,* 376 F.2d 659 (5th Cir.1967). Having tentatively found the facts that it did, we cannot fault the district court for restraining Stinson from exercising the powers that are delegated to a senator by the people, even though the court was not able to find that he received less than a plurality of the legally cast votes.

However, the district court's tentative findings that there was "massive absentee ballot fraud, deception, intimidation, harassment and forgery," and that "many" of the absentee votes were tainted, do not, we conclude, justify its decision to order the certification of Marks. Marks' only claim of authority to exercise the people's delegated power rests upon his receiving a majority of the votes cast on the voting machines. Equating the machine vote with the will of the electorate disenfranchises the voters who cast legal absentee ballots. Moreover, it fails to take into account the will of electors who would have voted at the polling places but who unknowingly cast illegal absentee ballots relying on the assurances that were an integral part of the scheme which "the Board participated in and later tried to conceal." Slip op. at 26.

In the circumstances which confronted the district court, we believe the same principle that justified the unseating of Stinson dictates that Marks not be certified on the basis of the machine vote only. For the actions of a democratically elected body of representatives to be legitimate, the electorate must be assured that each of the representatives was the choice of the electorate. It follows, we believe, that Marks should not be certified unless and until the district court is satisfied that Marks would have won the election but for the wrongdoing.

As the Supreme Court has stated:

Undeniably, the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear. It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, *Ex parte Yarbrough,* 110 U.S. 651 [4 S.Ct. 152, 28 L.Ed. 274], and to have their votes counted, *United States v. Mosley,* 238 U.S. 383 [35 S.Ct. 904, 59 L.Ed. 1355].

*Reynolds v. Sims,* 377 U.S. 533, 554, 84 S.Ct. 1362, 1377–78, 12 L.Ed.2d 506 (1963). These voting rights are potentially violated, however, whenever an individual is sworn in as an elected representative without a demonstration that he or she was the choice of a plurality of the electorate. This is so because the possibility is left open that some other candidate actually received more votes than the declared winner, which would mean that each of the votes cast for this other candidate was ignored.

Plaintiffs argue that to require certainty of results here would be unfair to Marks. They note that the district court tentatively found that the wrongdoing of Stinson and the other defendants may have made it impossible to determine who would have won a fair election. Assuming that it is in fact impossible to determine a certain winner, Marks will be forced to endure the hardship of running again if he still wishes to fill the senate seat. Therefore, plaintiffs argue that Marks will, in effect, be punished for the wrongdoing of the defendants. Plaintiffs suggest that the way to deal with election results that are uncertain as a result of fraud is to have the "punishment" fall on the party who perpetrated the fraud. Plaintiffs' arguments, how-

ever, miss the mark. Our primary concern here is not to punish any individual candidate or party, but to promote the public's interest in having legislative power exercised only by those to whom it has been legally delegated. This interest is not served by arbitrarily ignoring the absentee vote, a substantial but undetermined portion of which was either legally cast or came from voters who would have gone to the polls but for the fraud. Just punishment for any wrongdoing that has been perpetrated may be pursued in other proceedings; it is not the objective here.

We find the decision of the Court of Appeals for the First Circuit in *Griffin v. Burns*, 570 F.2d 1065 (1st Cir.1978), instructive here. That case involved a primary election to select a Democratic candidate for a vacancy on the Providence City Council. Rhode Island law provided for absentee ballots in elections of municipal officers but was silent regarding their use in party primaries for municipal office candidates. The officials responsible for the election distributed absentee ballots, and all absentee ballots cast by qualified voters in the manner directed by the board of elections were counted in certifying the winner. In the ensuing litigation the Supreme Court of Rhode Island concluded that there was "no constitutional or statutory basis for allowing ... absentee voters to cast their votes in a primary election." *Id.* at 1068. The court directed the decertification of the previously declared winner, and the board of canvassers certified a new winner based solely on the machine cast ballots.

A civil rights class action was commenced in federal court by the absentee voters alleging that the failure to count their ballots constituted a violation of the due Process Clause of the Fourteenth Amendment. The district court found such a violation, stressing that the plaintiffs had followed the instructions of the officials charged with running the election, and ordered a new election. The Court of Appeals affirmed, observing with respect to the constitutional violation:

> [W]hile ... local election irregularities, including even claims of official misconduct, do not usually rise to the level of constitutional violations where adequate state corrective procedures exist, there remain some cases where a federal role is appropriate. The right to vote remains, at bottom, a federally protected right. If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots; and the question of the availability of a fully adequate state corrective process is germane. But there is precedent for federal relief where broad-gauged unfairness permeates an election, even if derived from apparently neutral action.

> \* \* \* \* \* \*

> The present situation, judged in light of the standards we have discussed, presented a due process violation for which relief under § 1983 was appropriate. The district court was not asked to examine the validity of individual ballots or to supervise the administrative details of a local election. It was asked to remedy a broad-gauged unfairness that infected the results of a local election.

*Id.* at 1077, 1078.

The candidate who won the machine vote argued that the plaintiffs failed to establish that "enough of the disenfranchised absentee voters would have voted in person to have altered the result." *Id.* at 1079. The court rejected this argument and affirmed the order requiring an election, reasoning:

> Given the evidence of some voters—including two who were severely handicapped—that they would have voted in person, and the importance of the right to vote, the court could infer that it was more likely than not that a very significant proportion of those voting by absentee ballot would have gone to the polls had such ballots not been available. While the "outcome" test provides a sensible guideline for determining when federal judicial invalidation of an election might be warranted [citations omitted], it is not a principle requiring mathematical certainty. In cases of outrageous racial discrimination some courts have chosen not to apply it at all, but to invalidate the election simply for

its lack of integrity.... Here, the closeness of the election was such that, given the retroactive invalidation of a potentially controlling number of the votes cast, a new primary was warranted.

*Id.* at 1080.

While *Griffin*, unlike this case, did not involve a "massive absentee ballot fraud," that distinction does not diminish its helpfulness here.[13] Several points are worthy of note in the context of this case. First, the court concluded that rejection of a ballot where the voter has been effectively deprived of the ability to cast a legal vote implicates federal due process concerns. Second, the court's focus was not upon the alleged prejudice to a candidate who endured the rigors of electioneering and who *may* have been the choice of the electorate, but rather upon the right of the electors to vote and to have their votes counted. Finally, even in the absence of fraud, where it was not feasible to establish who would have won a properly conducted election, a new election was appropriate to restore the integrity of the electoral process.

We are mindful of the fact that our decision to sustain the preliminary injunction insofar as it relates to Stinson and to vacate it insofar as it relates to Marks will likely result in the voters of the second senatorial district being without representation in the Pennsylvania Senate during the pendency of this litigation. That prospect justifiably concerned the district court and was a primary reason for its ordering the certification of Marks. We think that concern justified the district court in expediting these proceedings and instructing the parties to prepare for an immediate trial on the merits. As we have noted, we do not think that concern justified the certification of a candidate who had not established his credentials.

Interim periods during which the voters of an area are without representation are inevitable. Vacancies periodically occur for a variety of reasons, and the process necessary to select someone to fill those vacancies necessarily takes time. Among the numerous factors that can make that period substantial are irregularities in the voting process and ensuing litigation. While substantial periods without representation are regrettable, the consequences of placing political power in unauthorized hands are of far graver concern.

We urge the district court to reach a final resolution of this case as soon as possible. The character and timing of further proceedings are, of course, left to its discretion. Those proceedings and the court's final judgment, however, should be consistent with this opinion. In particular, the district court should not direct the certification of a candidate unless it finds, on the basis of record evidence, that the designated candidate would have won the election but for wrongdoing.[14] *See, e.g., Curry v. Baker*, 802 F.2d 1302 (11th Cir.1986), *stay dismissed,* 479 U.S. 1301, 107 S.Ct. 5, 93 L.Ed.2d 1 *cert. denied,* 479 U.S. 1023, 107 S.Ct. 1262, 93 L.Ed.2d 819 (1986).

If the district court finds a constitutional violation, it will have authority to order a special election, whether or not it is able to determine what the results would have been in the absence of that violation. The district court need not exercise this authority, however. Depending on the circumstances existing at the time these proceedings are con-

---

**13.** *"Griffin* is also distinguishable from this case because there has been no finding here that the voters who cast legally unauthorized absentee ballots were reasonable in believing they were proceeding in a legally authorized manner. While the district court's findings of fact make clear that two members of the Board knowingly aided Stinson's "new way to vote" program, there is no finding that those casting unauthorized absentee ballots relied on express or implied representations of election officials as occurred in *Griffin*. Nothing in *Griffin* suggests that a new election is required in all instances in which voters, reasonably or unreasonably, make a mistake about the place or manner in which

they are authorized to vote. Nor do we so suggest."

**14.** We do not suggest that such a finding would have to be made with mathematical precision. Courts, with the aid of expert testimony, have been able to demonstrate that a particular result is worthy of the public's confidence even though not established solely by applying mathematics to the record evidence. *See, e.g., Curry,* 802 F.2d at 1317–19. What is required is evidence and an analysis that demonstrate that the district court's remedy is worthy of the confidence of the electorate.

cluded, a special election to fill the vacancy for the remainder of the year may not be justifiable in terms of the expense to the state and the burden on the candidates, voters, and election officials. The district court may exercise its own discretion in light of the circumstances then existing or it may simply invalidate the election, declare that there is a vacancy, and leave the decisions concerning a special election and the timing thereof to the appropriate state authorities.

## VI. CONCLUSION

We will vacate that portion of the district court's preliminary injunction that required the Board of Elections to certify Marks. The remainder of the preliminary injunction will remain in effect until further order of the district court.