

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-1-1996

# Colville v. Allegheny Co. Ct. of Comm. Pleas

Precedential or Non-Precedential:

Docket 95-3014

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Colville v. Allegheny Co. Ct. of Comm. Pleas" (1996). *1996 Decisions.* Paper 224.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/224

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


N0. 95-3014


FOCUS, (For Our Children's Ultimate Safety),
a citizens' advocacy group; JACQUELINE COLVILLE;
CATHERINE SILVIO,

Appellants

v.

ALLEGHENY COUNTY COURT OF COMMON PLEAS,
Family Division Juvenile Section;
HONORABLE JOSEPH JAFFE


On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Civil Action No. 94-cv-02160)


Argued:  April 18, 1995

BEFORE:  STAPLETON, HUTCHINSON* and SEITZ, <u>Circuit Judges</u>

(Opinion Filed:  February 1, 1996)

Jon Pushinsky (Argued)
1808 Law & Finance Building
Pittsburgh, PA 15219
  and
Witold J. Walczak
American Civil Liberties Union
Greater Pittsburgh Chapter
237 Oakland Avenue
Pittsburgh, PA 15213
  Attorneys for Appellants
  FOCUS, Colville and Silvio

*  The Honorable William D. Hutchinson was a member of the panel
   which heard this appeal, but died before the opinion issued.

David M. Donaldson (Argued)
Administrative Office of PA Courts
1515 Market Street, Suite 1414
Philadelphia, PA 19102
  Attorneys for Appellees
  The Court of Common Pleas of
  Allegheny County and
  Honorable Joseph Jaffe

OPINION OF THE COURT

STAPLETON, Circuit Judge:

A citizen's advocacy group, "For Our Children's Ultimate Safety" ("FOCUS"), and two of the group's members, Jacqueline Colville and Catherine Silvio (collectively, the "plaintiffs"), appeal from an order of the United States District Court for the Western District of Pennsylvania granting a motion to dismiss their 42 U.S.C. § 1983 claim against the Family Division of the Allegheny County Court of Common Pleas and a judge of that court. Their claim arises out of gag orders entered during a celebrated child custody case, In re Byron Griffin, No. 1608-92 (Pa. C.P. filed Aug. 21, 1992) (the "Baby Byron" case), currently pending before the court of common pleas. The gag orders prohibited the parties to that case from discussing the case with the public. FOCUS (but not the individual plaintiffs) attempted to intervene in the Baby Byron case, arguing that the gag orders violated its rights under the First Amendment.

In a quick series of events, (1) the court of common pleas rebuffed FOCUS' attempt to intervene, (2) the Pennsylvania

Superior Court refused to entertain FOCUS' motion for a writ of mandamus, and (3) the Pennsylvania Supreme Court denied FOCUS' petition to exercise its King's Bench jurisdiction to declare the gag orders unconstitutional.  FOCUS then joined forces with the two individual plaintiffs and filed this § 1983 suit in federal district court, alleging that the state court and its judge violated their First Amendment rights.  The district court dismissed all claims against the state court on Eleventh Amendment grounds.  It then dismissed the claims against the judge, holding that it did not have subject matter jurisdiction under the Rooker–Feldman doctrine and also that it should abstain under Younger v. Harris, 401 U.S. 37 (1971).

The plaintiffs appeal only the district court's Rooker–Feldman and Younger rulings.  The plaintiffs do not appeal the district court's decision to dismiss their claims against the state court on Eleventh Amendment grounds.  We hold that neither the Rooker–Feldman doctrine nor Younger bars the plaintiffs' federal challenge to the judge's gag orders, and we will accordingly reverse and remand for further proceedings.

I.

FOCUS is a Pittsburgh, Pennsylvania unincorporated association consisting of some fifty birth and foster parents whose goal is to make the Allegheny County Children and Youth Services ("CYS") more accountable, accessible and understandable. One of FOCUS' activities is to acquire information about the operations, policies and practices of CYS by listening to and

advising individuals affected by the agency's activities. FOCUS has been interested in the highly-publicized[1] Baby Byron case, a child dependency and adoption proceeding which involves a dispute between white foster parents and the biological mother over the placement of two young black children.

FOCUS claims that its attempts to keep informed about the Baby Byron case have been hampered by several gag orders. The first order, issued on January 24, 1994, states:

> [I]t is hereby ORDERED, ADJUDGED, and DECREED that the parties and their counsel and others having knowledge or information whatsoever regarding this case are prohibited from releasing any such knowledge or information, in whole or in part, to the media or otherwise.

(App. at 16.) The second gag order, issued on November 1, 1994, directs that:

> [The] parties are to have no contact with the public vis a vis discussing or referring to this case in any public context or forum.

(App. at 18.) The judge reaffirmed the second order on November 14, 1994, and it remains in effect today.

The parties to the Baby Byron case have not challenged the gag orders. The plaintiffs allege that this is because the judge has threatened to deny custody of the child to any party that publicly discusses the case. The plaintiffs further allege that the child's foster parents, Karen and Michael Derzack, "recently released a book detailing their experiences with Byron

---

[1] *E.g.*, Alyssa Gabbay, <u>Baby Byron Case Illustrates Black-and-White Issue of Adoption</u>, L.A. Times, Sept. 17, 1995, at A22 (stating that the case has focused national attention on the issue of transracial adoption and has inspired nationwide media coverage, a book, legislation, and a recent motion picture).

and their frustration with CYS and the courts," thus indicating that the Derzacks were willing to talk at some point prior to the entry of the gag orders.  (App. at 9.)

On November 14, 1994, FOCUS (without Colville and Silvio) moved to intervene in the Baby Byron case for the limited purpose of challenging the gag orders on free speech grounds. The judge's tipstaff informed FOCUS that the judge would not accept FOCUS' intervention motion and that FOCUS would not be permitted to present argument in opposition to the gag orders. FOCUS claims that the judge refused even to accept the motion to intervene so that he would not have to deny it formally.

FOCUS immediately filed an "Emergency Petition For a Writ of Mandamus" with the Superior Court of Pennsylvania, seeking an order compelling the judge to permit FOCUS to intervene in the Baby Byron case and to participate in that afternoon's scheduled hearing.  The superior court immediately denied that motion for lack of jurisdiction.

FOCUS responded on November 16, 1994, by filing a "Petition For Extraordinary Relief And Request For Expedited Decision" with the Pennsylvania Supreme Court, seeking to invoke the court's extraordinary "King's Bench" jurisdiction pursuant to 42 Pa. Cons. Stat. Ann. §§ 502, 726.  Unlike the Emergency Petition to permit intervention, however, FOCUS asked the court to issue an order declaring the gag orders unconstitutional.  The supreme court denied the Petition for Extraordinary Relief on December 12, 1994 without explanation.

On December 19, 1994, FOCUS joined with individual plaintiffs Silvio and Colville to file their verified complaint and motion for a temporary restraining order in the United States District Court for the Western District of Pennsylvania. The defendants moved to dismiss the next day for lack of subject matter jurisdiction. On December 22, 1994, the district court held a hearing on the motion to dismiss and granted it for the reasons stated above. This timely appeal followed.

## II.

The parties do not raise the issue but, before we can proceed further on the merits, we must satisfy ourselves that the plaintiffs have standing to present their free speech challenges to the gag orders. E.g., Elkin v. Fauver, 969 F.2d 48, 52 n.1 (3d Cir.) (considering standing issue sua sponte and noting that the courts of appeals have an independent obligation to ensure that federal jurisdiction is present in cases coming before them), cert. denied, 113 S. Ct. 473 (1992). "The party invoking federal jurisdiction bears the burden of establishing" the elements of standing, and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). Thus, "when standing is challenged on the basis of the pleadings, we 'accept as true all material allegations in the complaint, and . . . construe the complaint in favor of the complaining party.'"

Pennell v. City of San Jose, 485 U.S. 1, 7 (1988) (quoting Warth v. Seldin, 422 U.S. 490, 501 (1975)).

The standing issue arises in this case because the gag orders merely constrain the speech of the parties and the attorneys to the Baby Byron case; the plaintiffs do not complain that the orders affirmatively constrain their speech in any way.[2] Of course, that alone does not mean the plaintiffs' case fails for lack of standing. "We have routinely found, as have other courts, that third parties have standing to challenge protective orders and confidentiality orders in an effort to obtain access to information or judicial proceedings." Pansy v. Borough of Stroudsburg, 23 F.3d 772, 777 (3d Cir. 1994) (footnote omitted); see also In re Dow Jones & Co., 842 F.2d 603, 607 (2d Cir.) (noting the rights of potential recipients of speech to challenge the abridgment of that speech), cert. denied, 488 U.S. 946 (1988).

That putative recipients of speech usually have standing to challenge orders silencing would-be speakers does not necessarily mean that the plaintiffs in this case have standing, however. The plaintiffs still must show that the gag orders have caused them injury in fact and that their injury is likely to be redressed by a favorable decision. See, e.g., United States v. Hays, 115 S. Ct. 2431, 2435 (1995) (setting forth the three

---

[2]   The first order does speak to "others having knowledge or information regarding this case." The plaintiffs do not claim that this order restrains their own speech, however. Instead, they complain that the gag orders restrain the speech of the Baby Byron parties and their lawyers.

elements necessary to satisfy "the irreducible constitutional minimum of standing").

Accordingly, courts have found that third parties have standing to challenge a gag order only when there is reason to believe that the individual subject to the gag order is willing to speak and is being restrained from doing so. E.g., In re Dow Jones, 842 F.2d at 607 (determining whether the recipients have standing required the court first to examine "[w]hether the [plaintiff] news agencies are actually potential receivers of otherwise restrained speech"); Public Citizen v. Liggett Group, Inc., 858 F.2d 775, 787 n.12 (1st Cir. 1988) (emphasizing that the third party had standing to challenge a protective order because "far from agreeing to the protective order, the plaintiffs to this action have opposed the protective order at every stage" and the speech, therefore, would be available); Radio & Television News Ass'n v. District Court, 781 F.2d 1443, 1448 (9th Cir. 1986) (holding that the press lacks standing to assert the free speech rights of another when the person subject to the gag order has not challenged it).

Our cases are consistent with this view. In Pansy, for example, we employed an "available material" approach when we inquired into the practical effect of vacating the order of confidentiality at issue in that case; we noted that the plaintiff newspapers "ha[d] an interest in vacating the Order of Confidentiality" because they then could obtain the required information through Pennsylvania's Right to Know Act. 23 F.3d at 784. Similarly, in United States v. Cianfrani, 573 F.2d 835, 845

(3d Cir. 1978), we held that the intervening newsgathering organizations and reporters had standing to challenge the district court's order excluding the public from a pretrial suppression hearing and sealing the record of that hearing. There, speech was in fact going on and was thus "available," but the challenged order denied the intervenors the right to receive it.

Looking at the allegations in the verified complaint in the light most favorable to the plaintiffs here, there are reasons to conclude that the plaintiffs have adequately met a "willingness of the speaker" requirement for standing at this stage of the litigation. As we have noted, while neither party to the Baby Byron case is on the record as being opposed to the gag orders, the Derzacks at least were willing to talk at some point prior to the entry of the gag orders; The complaint alleges that the Derzacks "recently released a book detailing their experiences with Byron and their frustration with CYS and the courts." (App. at 9.) Moreover, the complaint further alleges that the judge "has threatened to remove Byron from the Derzack's [sic] home if the Derzacks appear publicly to promote their book or otherwise discuss their case." (App. at 10.) It is reasonable to infer from these allegations that the Derzacks are willing but restrained speakers who dare not challenge the gag orders for fear of reprisal from the judge. At this stage, we must accept these allegations and this permissible inference in the plaintiffs' favor.

In sum, we find that the plaintiffs have alleged facts in their verified complaint which would be sufficient to survive a motion to dismiss for lack of standing. It follows that we may proceed to entertain this appeal. Nonetheless, the plaintiffs upon remand still bear the burden of proving standing whenever it is challenged. See, e.g., Defenders of Wildlife v. Lujan, 911 F.2d 117, 120 (8th Cir. 1990) ("[A] court's refusal to dismiss an action for lack of standing does not relieve the plaintiff of the burden of actually proving standing where a defendant contests the factual basis for standing."), rev'd on other grounds, 504 U.S. 555 (1992). The plaintiffs must prove that the Baby Byron parties are willing to talk publicly about that case. If the district court, at any point, concludes to the contrary on the basis of an appropriate record, then it should proceed no further.[3]

## III.

We exercise plenary review over an order granting a motion to dismiss for lack of subject matter jurisdiction. Delaware Valley Citizens Council for Clean Air v. Davis, 932 F.2d 256, 264 (3d Cir. 1991). Because the district court dismissed

_____

[3] The district court may choose to address the standing issue in a pre-trial proceeding or at trial. See Doherty v. Rutgers Sch. of Law-Newark, 651 F.2d 893, 898 & n.6 (3d Cir. 1981); 13A Charles A. Wright et al., Federal Practice & Procedure § 3531.15, at 97-104 (1984 & Supp. 1995). Regardless of the procedure chosen ultimately to determine this issue, however, our decision here finding standing based on the allegations of the complaint neither forecloses the district court from reexamining the issue nor absolves the plaintiffs from carrying their burden of proof.

the complaint before the defendants filed an answer, we review whether the complaint alleges facts on its face which, if taken as true, would be sufficient to invoke the district court's jurisdiction. Licata v. United States Postal Serv., 33 F.3d 259, 260 (3d Cir. 1994).

The district court ruled that the plaintiffs' suit was barred by the Rooker-Feldman doctrine. The Rooker-Feldman doctrine provides that "federal district courts lack subject matter jurisdiction to review final adjudications of a state's highest court or to evaluate constitutional claims that are 'inextricably intertwined with the state court's [decision] in a judicial proceeding.'" Blake v. Papadakos, 953 F.2d 68, 71 (3d Cir. 1992) (alteration in original) (quoting District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 483 n.16 (1983)); see also Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923). We have interpreted the doctrine to encompass final decisions of lower state courts. Port Auth. Police Benev. Ass'n v. Port Auth., 973 F.2d 169, 178 (3d Cir. 1992). We have also concluded that "Rooker-Feldman does not bar individual constitutional claims by persons not parties to earlier state court litigation . . . ." Valenti v. Mitchell, 962 F.2d 288, 298 (3d Cir. 1992).

When a plaintiff seeks to litigate a claim in a federal court, the existence of a state court judgment in another case bars the federal proceeding under Rooker-Feldman only when entertaining the federal court claim would be the equivalent of an appellate review of that order. For that reason, Rooker-Feldman applies only when in order to grant the federal plaintiff

the relief sought, the federal court must determine that the state court judgment was erroneously entered or must take action that would render that judgment ineffectual. Marks v. Stinson, 19 F.3d 873, 886 n.11 (3d Cir. 1994) (holding Rooker–Feldman inapplicable where "the district court could (and did) find that [the plaintiffs'] constitutional claims had merit without also finding that the [state] court erred"). As the Eighth Circuit Court of Appeals wrote recently:

> A federal district court has jurisdiction over general constitutional challenges if these claims are not inextricably intertwined with the claims asserted in state court. A claim is inextricably intertwined if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it. In other words, Rooker–Feldman precludes a federal action if the relief requested in the federal action would effectively reverse the state decision or void its ruling. Accordingly, to determine whether Rooker–Feldman bars [plaintiff's] federal suit requires determining exactly what the state court held . . . . If the relief requested in the federal action requires determining that the state court decision is wrong or would void the state court's ruling, then the issues are inextricably intertwined and the district court has no subject matter jurisdiction to hear the suit.

Charchenko v. City of Stillwater, 47 F.3d 981, 983 (8th Cir. 1995) (citations omitted).

Three state courts were involved in FOCUS' attempts to lift the gag orders issued in the Baby Byron case: the Family Division of the Allegheny County Court of Common Pleas, the Pennsylvania Superior Court, and the Pennsylvania Supreme Court.

No one claims that the superior court's refusal to hear the plaintiffs' claim was an "adjudication" of FOCUS' First Amendment claim for Rooker-Feldman purposes. Instead, the defendants concentrate on the common pleas and the supreme court decisions, arguing that they were "adjudications" which were "inextricably intertwined" with FOCUS' First Amendment claims for the purposes of Rooker-Feldman. We address each of those decisions in turn.

The judge allegedly took two actions in the common pleas proceeding: (1) his initial decision to issue the gag orders and (2) his thwarting of FOCUS' attempt to intervene. The first set of decisions can be dealt with quickly. None of the plaintiffs was a party at the time the judge issued the original gag orders. As a result, the Rooker-Feldman doctrine would not have barred the plaintiffs--once the gag orders issued --from proceeding straight to federal court to challenge their constitutionality. Valenti, 962 F.2d at 298.[4]

The plaintiffs argue that the judge's thwarting of FOCUS' attempt to intervene should not be viewed as an adjudication. While one could debate whether his tipstaff's refusal to accept the motion is an adjudication, we think there is a far easier way to resolve the matter. The crucial issue is not whether the action itself is "adjudicative." Instead, the

---

[4] The defendants argue that Rooker-Feldman bars the plaintiffs' federal claims in part because the First Amendment issues were "inextricably intertwined" with the judge's gag order decisions. That is correct inasmuch as the parties to the Baby Byron case could not bring a First Amendment case in federal court challenging the gag orders. Under Valenti, however, Rooker-Feldman does not prohibit third parties--such as plaintiffs here--from challenging a state court gag order in federal court.

issue is (1) whether the judge adjudicated FOCUS' First Amendment claim and, if not, (2) whether his decision (if any) is inextricably intertwined with FOCUS' First Amendment claim.

The judge did not decide FOCUS' constitutional challenge to the gag orders or any other issue that is a predicate to the claim in the federal proceeding.  In short, we have no reason to believe that in order for FOCUS to prevail in federal court, the court must decide "that the state court decision [on intervention] is wrong."  Charchenko, 47 F.3d at 983.  In this respect, this situation is indistinguishable from the one we faced in Marks v. Stinson, 19 F.3d 873 (3d Cir. 1994).  In that case, some of the plaintiffs had filed petitions with the Philadelphia Court of Common Pleas asking relief on the basis of fraud and alleged constitutional violations in connection with an election.  The court refused to entertain their claims asserting that it lacked jurisdiction to do so.  We held that a subsequent proceeding in the district court was not barred by the Rooker-Feldman doctrine:

> [T]he court was not barred under Rooker-Feldman from hearing the constitutional and fraud claims of Marks and the Republican State Committee ("RSC") because these claims had not been determined by the state court, nor were they inextricably intertwined with a prior state court decision.  Specifically, the court of common pleas dismissed Marks' and the RSC's claims without reaching the merits.  Therefore, the district court was not faced with a situation where it was asked to review a determination of the state court. . . .  Here, the district court could (and did) find that Marks' and the RSC's fraud and constitutional claims had merit without also finding that the court of common pleas erred when it dismissed their proceedings.

Marks v. Stinson, 19 F.3d at 886 n.11.

Thus, had FOCUS stopped its state court activity at that point and filed this suit in federal district court, the Rooker–Feldman doctrine would not have barred it from challenging the constitutionality of the gag orders in federal court.

Whether the Pennsylvania Supreme Court's decision bars FOCUS' federal case presents a similar issue. FOCUS' motion before the supreme court was filed as a "Petition For Extraordinary Relief And Request For Expedited Decision." It asked the supreme court to:

a. Assume [King's Bench] jurisdiction over the herein matter pursuant to 42 Pa.C.S.A. §§502 and 726, and Pa. Const. Art. V, §10(a);

b. Shorten the time to three (3) days for the filing of answers to the herein petition;

c. Issue forthwith an order declaring the gag orders to be an unconstitutional restraint of speech;

d. Issue forthwith an order vacating the gag orders; and

e. Award such other relief as is just and appropriate.

(App. at 68–69.) By order of December 12, 1994, the supreme court denied that petition without giving any reason.

Once again, we conclude that a federal court determining the constitutionality of the gag orders would not need to conclude that the state court's decision was erroneous. Nor would it be required to invalidate in any way the state court's dispositive order.

The King's Bench jurisdiction of the Supreme Court of Pennsylvania has been characterized by that court as "our extraordinary jurisdiction"--a discretionary jurisdiction to "be invoked sparingly, and only in cases 'involving an issue of immediate public importance.'" Washington County Comm'rs v. Pennsylvania Labor Relations Bd., 417 A.2d 164, 167 (Pa. 1980) (quoting 42 Pa. Cons. Stat. Ann. § 726). As the court explained in Philadelphia Newspapers, Inc. v. Jerome, 387 A.2d 425, 430 n.11 (Pa. 1978), appeal dismissed, 443 U.S. 913 (1979):

> [T]he presence of an issue of immediate public importance is not alone sufficient to justify extraordinary relief. As in requests for writs of prohibition and mandamus, we will not invoke extraordinary jurisdiction unless the record clearly demonstrates a petitioner's rights. Even a clear showing that a petitioner is aggrieved does not assure that this Court will exercise its discretion to grant the requested relief. See Illinois v. City of Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972).

The Pennsylvania Supreme Court's order of December 12, 1994, is consistent with an exercised discretion on its part not to invoke its extraordinary jurisdiction. Its failure even to comment on the constitutional issue strongly suggests that this was the basis for its disposition. It is sufficient for present purposes, however, to note that nothing in the record of the proceedings before the Supreme Court of Pennsylvania affirmatively indicates that it adjudicated the First Amendment issue that the plaintiffs have presented to the district court in this case.

Where the extraordinary jurisdiction of a court is unsuccessfully invoked and the court does not expressly adjudicate the tendered merits issue, the general rule is that there is no preclusive effect and the petitioning party is free subsequently to pursue his claim in any appropriate forum. E.g., Hiley v. United States, 807 F.2d 623, 625-26 (7th Cir. 1986); United States v. Dean, 752 F.2d 535, 541 (11th Cir. 1985), cert. denied, 479 U.S. 824 (1986). While we have found no case of the Supreme Court of Pennsylvania directly on point, we are confident that it would give its December 12th order no claim preclusive effect. Accordingly, we are not bound to give it claim preclusive effect.

While this does not directly answer the Rooker-Feldman issue presented by the December 12th order, we think it points the way. As we have previously noted, "the Rooker-Feldman doctrine has a close affinity to the principles embodied in the legal concepts of claim and issue preclusion." Valenti, 962 F.2d at 297. Moreover, because the December 12th order did not affect the legal relationship before the parties and did not preclude further proceedings on the constitutional issue tendered, it is clear that the district court in this case is not being asked here to play the role of a reviewing court. Not only is the district court being asked to adjudicate an issue distinct from any the Supreme Court of Pennsylvania expressly adjudicated, it is also being asked to grant relief that is entirely consistent with the existence of the December 12th order.

For these reasons, we conclude that this issue is governed by the principles set forth in <u>Marks v. Stinson</u>, even though the Supreme Court of Pennsylvania, unlike the court of common pleas in <u>Marks</u>, declined to give a reason for its disposition.  Accordingly, we hold that the <u>Rooker-Feldman</u> doctrine presents no bar to the plaintiffs' federal court action.[5]

IV.

The district court also held that it should abstain from asserting jurisdiction under <u>Younger v. Harris</u>, 401 U.S. 37 (1971).  We exercise plenary review over the legal determinations of whether the requirements for <u>Younger</u> abstention have been met and, if so, we review the district court's decision to abstain for abuse of discretion.  <u>O'Neill v. City of Phila.</u>, 32 F.3d 785, 790 (3d Cir. 1994), <u>cert. denied</u>, 115 S. Ct. 1355 (1995).

Three requirements must be met before <u>Younger</u> abstention is appropriate: (1) there must be an ongoing state judicial proceeding to which the federal plaintiff is a party and with which the federal proceeding will interfere, (2) the state

---

[5]  The individual plaintiffs have an additional argument supporting their view that <u>Rooker-Feldman</u> does not bar their federal court challenges.  As we have stated, "<u>Rooker-Feldman</u> does not bar individual constitutional claims by persons not parties to earlier state court litigation . . . ." <u>Valenti</u>, 962 F.2d at 298. Drawing an analogy to concepts of claim preclusion and issue preclusion, however, in this particular case we would group the individual plaintiffs together with FOCUS for both <u>Younger</u> and <u>Rooker-Feldman</u> purposes. <u>Cf.</u> 18 Charles A. Wright et al., <u>Federal Practice & Procedure</u> § 4456, at 491-92 (1981 & Supp. 1995).

proceedings must implicate important state interests, and (3) the state proceedings must afford an adequate opportunity to raise the constitutional claims. Port Auth., 973 F.2d at 173. We conclude that the first requirement is not present here. The judge's refusal to accept or to rule upon FOCUS' motion to intervene means that FOCUS was never a party in state court--and there was no ongoing case for Younger purposes--until FOCUS filed its King's Bench petition in the Pennsylvania Supreme Court. Since that proceeding had been terminated without an adjudication of the constitutional issue at the time of the filing of the federal complaint, Younger abstention was improper.

        The parties agree that the Baby Byron case is "ongoing." Still, while the Baby Byron case is ongoing in the usual sense, it is not "ongoing" for Younger purposes because FOCUS has never been allowed to intervene and cannot there secure an adjudication of its constitutional claim. The defendants acknowledge, as they must, that FOCUS never became a party to the custody hearings. The best they can do is to argue that FOCUS tried to become a party and that this should suffice for Younger purposes. While the defendants grant that FOCUS cannot secure an adjudication of its First Amendment claim from the court of common pleas with the state case in its present posture, they propose a rule that any party who attempts unsuccessfully to intervene in a state proceeding may not seek federal relief unless and until she has exhausted any possibility of overturning the decision on intervention. This would include, in the

defendants' view, filing a King's Bench petition seeking an order permitting intervention.

We find no basis for implying a duty to exhaust all available state process in pursuit of intervention and, accordingly, see no reason why FOCUS, once rejected by the court of common pleas, was not free to seek relief immediately from a federal court.  Our observations in Marks about Younger abstention are equally applicable here:

> [I]t is . . . important to recognize that a person with a federal Civil Rights Act claim has no duty to exhaust state remedies before pursuing his or her claim in the federal courts.  Patsy v. Board of Regents, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). Younger principles must be applied in a manner consistent with this well-established proposition.  As we noted in Monaghan v. Deakins, 798 F.2d 632, 638 (3d Cir. 1986), aff'd in part and vacated in part, 484 U.S. 193, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988), "in no case has the Supreme Court or this court ever turned the propriety of a Younger dismissal upon the mere availability of a state judicial proceeding."  Thus, the

> plaintiffs in this proceeding could have
> proceeded in federal court without having
> resorted to the state's judicial process.

Marks v. Stinson, 19 F.2d at 882.

These principles were recently applied by the Court of Appeals for the Seventh Circuit in a context very similar to that presented here.  In Hoover v. Wagner, 47 F.3d 845 (7th Cir. 1995), the plaintiffs were two anti-abortion demonstrators and a journalist who reports on anti-abortion demonstrations.  They brought a § 1983 declaratory action seeking relief from a Wisconsin state court injunction limiting the anti-abortion activities of several named state court defendants "and all persons acting in concert with them."  The federal plaintiffs were not parties to the ongoing suit in which the injunction had been entered but alleged that they wished to protest abortions at the clinics named in the injunction (or in the case of the journalist to write about such protests) and that they were deterred from engaging in First Amendment protected activity by a well-grounded fear that the injunction would be interpreted as prohibiting their activity on pain of criminal contempt.  The defendants in the federal proceeding raised Younger abstention as a bar to relief, asserting that "the plaintiffs should have intervened in the state court injunction proceeding and then they could have gotten the adjudication they want, in the state courts."  47 F.3d at 848.  The Court of Appeals held that there was no duty to intervene, observing that "nothing in Younger or the cases following it suggests that persons claiming a violation of their federal rights have an obligation before turning to

federal court to see whether there is some state court proceeding they might join in order to present their federal claims there." Id.

If a would-be federal plaintiff in a civil rights action has no duty to attempt to intervene in an ongoing state suit in which he might be able to tender his constitutional issue, it follows, we believe, that FOCUS, once rejected by the court that entered the gag order, had no duty to exhaust all extraordinary state remedies in an attempt to intervene. The Younger doctrine is based on comity and the notion that comity makes it undesirable to permit a party access to a federal court when he is currently involved in state proceedings where he can secure an adjudication of his constitutional claim. We believe FOCUS has done everything that considerations of comity can reasonably require of it. It could have gone directly to federal court without seeking to intervene. Consistent with considerations of comity, however, it afforded the court of common pleas an opportunity to adjudicate its constitutional challenge but was rebuffed without a ruling on that challenge. The interests of comity would be ill served, we believe, were we to hold that FOCUS by so acting in the service of comity had erected substantial barriers to its federal court access. We decline to so hold.

Because there is no ongoing state proceeding in which FOCUS can secure an adjudication of its constitutional claim, we hold that Younger abstention was inappropriate.

V.

Finally, citing <u>Hoover v. Wagner</u>, 47 F.3d 845 (7th Cir. 1995), the defendants assert "basic principles of equity" as alternative grounds for affirming the district court.  As we have explained, in <u>Hoover</u> potential anti-abortion protestors and a journalist--none of whom were named defendants in the state court action--sought declaratory and injunctive relief against the state court injunction on the ground that the order violated their rights under the First Amendment.  After first finding <u>Younger</u> inapplicable, the court of appeals affirmed the district court's dismissal because the remedy sought was unworkable.

> The court reasoned:
> [The plaintiffs] want the federal court to
> tell the state judge to rewrite his
> injunction to make it clearer, to refrain
> from convicting anybody who does not really
> and truly violate the injunction as revised,
> and to tell the police chief and the judge
> not to infer that people are assisting in
> violating the injunction from their mere
> proximity to defendants named in the
> injunction.  The relief that the plaintiffs
> seek is at once an insult to the judicial and
> law enforcement officials of Wisconsin, an
> interference with an ongoing state court
> proceeding, and an empty but potentially
> mischievous command to these officials to
> avoid committing any errors in the
> enforcement of the [state court] injunction
> . . . .
>         . . .  The plaintiffs' able counsel,
> when pressed at oral argument, was unable to
> suggest a useful amendment to the injunction
> and acknowledged that what he really wants
> from the federal courts is a firm warning to
> Wisconsin officialdom that they are not to
> trample on his clients' constitutional
> rights. . . .  [T]he difficulty of framing a
> useful injunction, when considered in
> conjunction with the affront to comity that

> such an injunction would constitute and the
> nebulous and speculative character of the
> fears that have led the plaintiffs to sue,
> convinces us that this suit is an
> inappropriate invocation of the equity powers
> of the federal courts.

Id. at 850-51.

Hoover is inapposite. The plaintiffs in Hoover did not claim that the state court injunction as written violated their First Amendment rights; they asserted only that it was capable of being applied in a manner that violated those rights. They were asking the federal court to warn the state court and police officials to enforce the injunction in a constitutional way. The plaintiffs here, on the other hand, complain that the gag orders can only be applied in ways that infringe on their First Amendment rights to receive information from willing speakers who will not speak solely because of those orders. While the district court may be confronted with a difficult merits issue when it attempts to reconcile First Amendment interests with Pennsylvania's interest in confidentiality for family court proceedings, there is no reason to believe that it will have any greater difficulty in fashioning an effective remedy than in any other § 1983 action challenging the constitutionality of state action. Thus, we cannot say that "this suit is an inappropriate invocation of the equity powers of the federal courts." Id. at 851.

VI.

For the foregoing reasons, we will reverse the district court's order granting the motion to dismiss and remand for further proceedings consistent with this opinion.