

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-14-1999

# Chiropractic America v. Lavecchia

Precedential or Non-Precedential:

Docket 99-5060

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"Chiropractic America v. Lavecchia" (1999). *1999 Decisions.* Paper 101.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/101

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 14, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5060

CHIROPRACTIC AMERICA,

       Appellant

v.

JAYNEE LAVECCHIA, in her official capacity as
Commissioner of Department of Banking and Insurance
("DOB&I"), and DONALD BRYAN, in his official capacity
as Assistant Commissioner for Legislative and Regulatory
Affairs of DOB&I, CHRISTIE WHITMAN in her official
capacity as Governor of the State of New Jersey.

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 98-cv-4986)
District Judge: Hon. Jerome B. Simandle

Argued: March 2, 1999

Before: STAPLETON, RENDELL and ALDISERT,
Circuit Judges

(Filed April 14, 1999)

       Richard A. Jaffe (argued)
       5 Greenway Plaza, Suite 1710
       Houston, TX 77046

        ATTORNEY FOR APPELLANTS

        Joseph L. Yanotti (argued)
        John C. Grady
        Office of the Attorney General
         of New Jersey
        R.J. Hughes Justice Complex
        CN 117
        Trenton, NJ 08625

         ATTORNEYS FOR APPELLEES

OPINION OF THE COURT

ALDISERT, Circuit Judge.

Several New Jersey individual chiropractors and professional organizations that represent chiropractors appeal from the district court's dismissal of their complaint on the basis of abstention under Burford v. Sun Oil Co., 319 U.S. 315 (1943). They contend that the district court should have adjudicated their federal constitutional challenge to certain regulations of New Jersey's comprehensive no-fault automobile insurance law. The regulations were promulgated by Appellee Jaynee LaVecchia, Commissioner of the Department of Banking and Insurance. We will affirm.

I.

On May 19, 1998, in an attempt to reduce escalating automobile insurance costs in the state, the Legislature of the State of New Jersey enacted the Automobile Insurance Cost Reduction Act (the "Act"). The Act substantially restructured New Jersey's method of providing no-fault insurance benefits to automobile accident victims. This was an amendment of the state's 1972 no-fault insurance law, which previously had been amended in 1983, 1988 and 1990. The new Act was the result of the Legislature's determination

        that the substantial increase in the cost of medical
        expense benefits indicate[d] that the benefits [were]
        being over utilized for the purpose of gaining standing

2

to sue for pain and suffering, . . . necessitating the imposition of further controls on the use of those benefits, including the establishment of a basis for determining whether treatments or diagnostic tests are medically necessary.

N.J. Stat. Ann. S 39:6A-1.1. Thus, the Act states in relevant part:

Benefits provided under basic coverage shall be in accordance with a benefit plan provided in the policy and approved by the commissioner. The policy form, which shall be subject to the approval of the commissioner, shall set forth the benefits provided under the policy, including eligible medical treatments, diagnostic tests and services as well as such other benefits as the policy may provide. The commissioner shall set forth by regulation a statement of the basic benefits which shall be included in the policy. Medical treatments, diagnostic tests, and services provided by the policy shall be rendered in accordance with commonly accepted protocols and professional standards and practices which are commonly accepted as being beneficial for the treatment of the covered injury. . . . Protocols shall be deemed to establish guidelines as to standard appropriate treatment and diagnostic tests for injuries sustained in automobile accidents, but the establishment of standard treatment protocols or protocols for the administration of diagnostic tests shall not be interpreted in a [sic] such a manner as to preclude variance from the standard when warranted by reason of medical necessity.

N.J. Stat. Ann. S 39:6A-3.1(4)(a). "Medical necessity" exists when treatment of the particular injury "(1) is not primarily for the convenience of the injured person or provider, (2) is the most appropriate standard or level or service which is in accordance with standards of good practice and standard professional treatment protocols . . . and (3) does not involve unnecessary diagnostic testing." N.J. Stat. Ann. S 39:6A-2m.

The precise constitutional attack lodged by these Appellants concentrates on six so-called "care paths" in the

3

comprehensive regulations developed by the Commissioner with the assistance of PricewaterhouseCoopers. These care paths are a set of protocols and standard treatments and practices for specific diagnosed back injuries. Each care path designates the appropriate treatment for particular back injuries that can be reimbursed absent a showing of medical necessity. See N.J. Admin. CodeS 11:3-4. The regulations also include an arbitration mechanism for resolution of disputes concerning the medical necessity of treatment that deviates from or exceeds that which has been delineated in the care paths.

On September 8, 1998, the Commissioner published the proposed regulations, see 30 N.J. Reg. 3211, and received comments from the public through November 4, 1998. On November 4, 1998, the Commissioner held a public hearing to receive testimony concerning the proposed regulations. Representatives of health care providers, including chiropractic associations, attorneys and insurers, submitted written comments to the proposed regulations and presented testimony at the public hearing. Appellants stated that the care paths were "ill-conceived, detrimental to patient care, and dangerous."

After making minor modifications to the proposed regulations, the Commissioner signed the regulations for adoption on November 30, 1998. These modified regulations were scheduled to become operative on March 22, 1999. See 30 N.J. Reg. 4401(a).

Appellants filed their initial complaint in the district court on November 4, 1998, before the Commissioner adopted the regulations. After the regulations were adopted, three appeals challenging the regulations were filed in the New Jersey Superior Court, Appellate Division, one by physicians and other health care professionals and two by trial lawyers associations. Thereafter, in their first amended complaint filed in the District Court on January 12, 1999, Appellants alleged that the regulations violated their Fourteenth Amendment substantive due process, procedural due process and equal protection rights. Before us, Appellants explain:

> The final regulations contain only two changes concerning chiropractic care that are relevant to this

4

lawsuit. First, chiropractors can now treat auto accident victims with no serious injuries, (i.e. sprains and strains under care paths one, three and five for up to twelve visits during the first months....)

The final regulations state that chiropractors can treat patients with radiculopathy or herniated discs, (i.e. patients who fall under care paths two, four and six) as long as they have no positive or objective findings for either conditions.

Appellants' Brief at 5.

The First Amended Complaint alleged that the care paths eliminate the availability of reimbursable chiropractic care for victims of automobile accidents and severely restrict the number of reimbursable chiropractic care visits allowed in the first month following an automobile accident. Appellants based their substantive due process and equal protection claims on assertions that the care path provisions were arbitrary and capricious and were not rationally related to the legitimate aim of the enabling legislation. See App. at 50–51. As to their procedural due process count, Appellants contended that the regulations' arbitration provisions "den[ied] health care practitioners any practical right to contest the medical treatment judgments of the [personal injury protection benefits] carriers." App. at 52. Appellants sought declaratory and injunctive relief.

On the very next day, January 13, 1999, Appellants filed an appeal in the New Jersey Superior Court that sets forth issues similar to those contained in the appeals of the health care professionals. Both of these appeals are now pending before the New Jersey Superior Court, and challenge the regulations as being beyond the scope of the Department of Banking and Industry, and as establishing rigid care paths and treatment mandates contrary to accepted standards of medical care. They contend that the regulations unreasonably substitute the agency's dictates for professional medical judgment of the injured person's physician by specifying the precise care to be provided. They contend also that the agency has acted in a manner inconsistent with the enabling legislation. See S.A. at 128,

5

139. All three groups of Appellants--health care professionals and physicians, attorneys and chiropractors--contend in these appeals that the regulations were adopted without appropriate consultation with national and state standard-setting for professional organizations. See S.A. at 128, 130, 139.

The district court abstained from ruling on Appellants' federal constitutional claims on the basis of Burford, and dismissed Appellants' First Amended Complaint. We have jurisdiction to consider the present appeal pursuant to 28 U.S.C. S 1291. Regarding a district court's abstention decision, our review of the underlying legal questions is plenary, but we review the decision to abstain for abuse of discretion. See Trent v. Dial Medical of Fla., Inc., 33 F.3d 217, 223 (3d Cir. 1994).

II.

At least since 1941, in Railroad Comm'n of Texas v. Pullman, 312 U.S. 496 (1941), the federal courts have recognized circumstances under which they will decline to adjudicate cases even though they have jurisdiction under the Constitution and statutes. These circumstances are loosely gathered under discrete concepts of abstention named after leading Supreme Court cases. The Court has said: "The various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases. Rather, they reflect a complex of consideration designed to soften the tensions inherent in a system that contemplates parallel judicial processes." Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 11 n.9 (1987).

Abstention from the exercise of jurisdiction, however, is the exception rather than the rule. Colorado River Water Conservation District v. United States, 424 U.S. 800, 813 (1976). Nevertheless, abstention is firmly rooted.

Several reasons are assigned for withholding the exercise of jurisdiction. Abstention is recognized to avoid deciding a federal constitutional question when the case may be disposed on questions of state law, Pullman; to avoid needless conflict with the administration by a state of its own affairs, Burford; to leave to the states the resolution of

6

unsettled questions of state law, Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25 (1959); to avoid duplicative litigation, Colorado River. In addition, the doctrine of "Our Federalism" teaches that federal courts must refrain from hearing constitutional challenges to state action under certain circumstances in which federal action is regarded as an improper intrusion on the right of a state to enforce its own laws in its own courts, Younger v. Harris, 401 U.S. 37 (1971).

At the risk of over-simplification, we can say that these reasons come within the rubric of comity, or the idea "that certain matters are of state concern to the point where federal courts should hesitate to intrude; and they may also concern judicial `economy,' the notion that courts should avoid making duplicate efforts or unnecessarily deciding difficult questions." Bath Memorial Hosp. v. Maine Health Care Fin. Comm'n, 853 F.2d 1007, 1012 (1st Cir. 1988).

We will affirm the district court's judgment on the basis of Burford abstention. We conclude that the Act and the regulations promulgated by the Commissioner represent a complex legislative and regulatory package designed to reform automobile insurance law in New Jersey, and that the courts of New Jersey are in the best position to consider the validity of the applicable regulations under state law, and can do so without having to examine the constitutional questions that have been raised by Appellants. "It is particularly desirable to decline to exercise equity jurisdiction when the result is to permit a state court to have an opportunity to determine questions of state law which may prevent the necessity of decision on a constitutional question." Burford, 319 U.S. at 333 n.29 (citing Chicago v. Fieldcrest Dairies, Inc., 316 U.S. 168, 173 (1942)).1 Thus, Burford clearly allows a federal court, in fact urges a federal court, to decline to exercise jurisdiction when adjudication of questions of state law (which can only be done by state courts) may avert the need to delve into constitutional issues like those presented here. This case

_____

1. The quoted language of Burford and Fieldcrest Dairies bears a strong resemblance to the Court's language in Pullman, thereby exhibiting how the various doctrines are not "rigid pigeonholes."

7

fits comfortably into the scheme envisioned by the Burford Court.

In Burford, the Supreme Court stated that a federal court should refuse to exercise its jurisdiction in a manner that would interfere with a state's efforts to regulate an area of law in which state interests predominate and in which adequate and timely state review of the regulatory scheme is available. See 319 U.S. at 332-334. The purpose of Burford abstention has been articulated by this court: " `to avoid federal intrusion into matters of local concern and which are within the special competence of local courts.' " Kentucky West Virginia Gas Co. v. Pennsylvania Public Util. Comm'n, 791 F.2d 1111, 1115 (3d Cir. 1986) (quoting International Bhd. of Elec. Workers v. Public Serv. Comm'n, 614 F.2d 206, 212 n.1 (9th Cir. 1980)); see also Meredith v. Talbot Cty., Md., 828 F.2d 228, 231 (4th Cir. 1987) ("The underlying purpose of Burford abstention is to enable federal courts to avoid needless conflict with the administration by a state of its own affairs."); 17A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction S 4243.

Recently the Supreme Court provided a clear definition of the Burford doctrine:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans, 491 U.S. 350, 361 (1989) (quoting Colorado River, 424 U.S. at 814). It is from this definition that we determine that the district court acted properly when it dismissed Appellants' First Amended Complaint.

8

A.

We begin with an analysis of whether timely and adequate state-court review is available, for "[o]nly if [the court] determines that such review is available, should it turn to the other issues." Riley v. Simmons, 45 F.3d 764, 771 (3d Cir. 1995).

Timely and adequate state-court review has been and continues to be available to Appellants. New Jersey law provides that a party may take an appeal as of right to the Superior Court of New Jersey, Appellate Division, for review of a final action of any state administrative agency or officer and for review of the validity of any rule promulgated by any state agency or officer. See N.J. Court Rule 2:2-3(a)(2). Appellants and three other groups of litigants havefiled such an appeal of the regulations promulgated by the Commissioner pursuant to the Act.

Appellants contend that the state-court proceeding could not provide timely and adequate review because the Appellate Division would have been unable to resolve the appeal prior to the regulations' March 22, 1999 effective date. Appellants also contend that the Appellate Division would not provide them with adequate relief because that court could not hold an evidentiary hearing. Both arguments fail.

First, the Appellate Division has the authority to accelerate the usual briefing and oral argument schedule, and is empowered to stay agency action pending appeal. See N.J. Court Rule 2:9-7. Further, if the Appellate Division declines its authority to stay the agency action, a party may submit an application for a stay with the Supreme Court of New Jersey "when necessary to prevent irreparable injury." N.J. Court Rule 2:2-2. Therefore, the Appellate Division had the ability to expedite the proceedings in order to rule on the validity of the regulations at issue here prior to March 22, 1999, or at least stay their enforcement until a ruling is issued.

Second, Appellants incorrectly assert that the Appellate Division is without power to hold an evidentiary hearing. New Jersey court rules permit supplementation of the record on appeal, including the presentation of live

9

witnesses before a specially designated judge of the New Jersey Superior Court. See N.J. Court Rule 2:5-5(b). Further, testimony presented by Appellants during the public hearing on November 4, 1998, as well as documents filed during the public comment period, became part of the record to be considered by the Appellate Division.

Appellants have not demonstrated the absence of timely and adequate state-court review in this matter. We therefore turn to the question of whether a federal court's adjudication of Appellants' claims would interfere with New Jersey's efforts to implement a policy concerning no-fault insurance law.

B.

The district court held, and we agree, that the second prong of the Burford doctrine, as laid out in New Orleans Public Service, supra, is applicable here. This prong of Burford requires us to examine three issues: (1) whether the particular regulatory scheme involves a matter of substantial public concern, (2) whether it is "the sort of complex, technical regulatory scheme to which the Burford abstention doctrine usually is applied," Felmeister v. Office of Attorney Ethics, 856 F.2d 529, 534 (3d Cir. 1988), and (3) whether federal review of a party's claims would interfere with the state's efforts to establish and maintain a coherent regulatory policy. See New Orleans Public Serv., 491 U.S. at 361. All three issues can be answered in the affirmative.

There can be no doubt that a state's efforts to curtail the skyrocketing costs of automobile insurance premiums within its borders present a matter of substantial public concern. New Jersey's dubious notoriety for "out-of-control" automobile insurance premiums has been well-documented and has reflected negatively on the state. See , e.g., Thomas Ginsburg, NJ Auto Insurance Up 8% in `96, The Philadelphia Inquirer, Feb. 12, 1998, at A1; Robert Schwaneberg, Insurers, Legislators Blame Car Premium Mess on Each Other, The Star-Ledger, Feb. 5, 1998, at 31; John Kolesar, Stuck in the Middle of the Road: The Legislature's Failure to Adopt True No-Fault Insurance has Permitted Jerseyans to

10

be Run Over by High Rates, The Star-Ledger, Nov. 23, 1997, at 1; Sharon Tennyson, The Impact of Rate Regulation on State Automobile Insurance Markets, 15 J. Ins. Reg. 502 (July 1, 1997). Since 1972, the New Jersey legislature has attempted to refine its no-fault insurance law in order to create a scheme that will serve New Jersey drivers and their passengers, insurers, health care service providers and those who represent them. The Act and the regulations promulgated by the Commissioner clearly pertain to a matter in which the state has a substantial and important interest.

Additionally, a review of the Act and the regulations establishes that we are presented with a complex regulatory scheme for purposes of Burford abstention. The Legislature and the Commissioner have promulgated all-encompassing, highly technical, extremely intertwined and interrelated provisions that describe the extent of reimbursable medical treatment, applicable deductibles and co-pays and accepted medical protocols. The regulations include detailedflow charts of the accepted care paths. There is a delineated dispute mechanism in place for accident victims who seek reimbursement for treatments that deviate from the care paths. There can be no doubt that the Act and regulations at issue here constitute a complex regulatory solution to the state's no-fault insurance problem.

Thus, we are left to examine whether federal review of Appellants' constitutional claims would interfere with New Jersey's efforts to establish and maintain a coherent regulatory policy. We believe that " `the regulatory system [has] as a central purpose uniformity to achieve important local interests that would be frustrated by federal court review.' " University of Md. v. Peat Marwick Main & Co., 923 F.2d 265, 272 (3d Cir. 1991) (quoting Erwin Chemerinsky, Federal Jurisdiction 112 (Supp. 1990)). The cases relied upon by Appellants present distinguishable factual scenarios from the one presented here, and lend further support for our holding.

The Act and regulations are aimed at reducing the high cost of automobile insurance in New Jersey. The State of New Jersey sought to achieve this goal by revising reimbursement standards for first-party, no-fault personal

11

injury protection medical expense benefits. The regulations address reimbursement for nearly all medical providers who treat automobile accident victims.

Thus, a court conducting a review of Appellants' due process and equal protection claims would have to examine the purpose of the Act, and determine whether the regulations conformed with the New Jersey Legislature's intent and whether the regulations singled out chiropractors and their patients for unfair treatment. Clearly, the regulations would be subject to rational basis/arbitrary and capricious examination in either sovereign's court. See Bowman Transportation, Inc. v. Arkansas–Best Freight Sys., Inc., 419 U.S. 281, 285–286 (1974) (agency action that does not implicate fundamental rights or suspect classes is subject to arbitrary and capricious review in which court examines whether there is rational basis for agency's action); Brady v. Department of Personnel, 693 A.2d 466, 472 (N.J. 1997) (review of state regulatory policy subject to arbitrary and capricious standard); Beattystown Community Council v. Department of Environmental Protection, 712 A.2d 1170, 1176 (N.J. Super. Ct. App. Div. 1998) (same). Because Appellants, and three other groups of plaintiffs, have presented an "arbitrary and capricious" argument to the Superior Court of New Jersey, Appellate Division, review by this court, or any federal court, at this time would interfere significantly with New Jersey's efforts to establish and maintain a coherent automobile insurance regulatory policy. See Alabama Pub. Serv. Comm'n v. Southern Railway, 341 U.S. 341, 349 (1951) ("As adequate state court review of an administrative order based upon predominantly local factors is available . . . intervention of a federal court is not necessary for the protection of federal rights.") (footnote omitted). Although Appellants have not raised Fourteenth Amendment claims before the Appellate Division, that court would have to conduct the same form of "arbitrary and capricious" review to resolve Appellants' state court allegations. The Appellate Division's scope of review under New Jersey Rule 2:2–3(a)(2) involves an examination of: "(1) whether the agency's action violates the express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on

which the agency bases its action; and (3) whether, in applying legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors." Matter of Musick, 143 N.J. 206, 216 (1996). Appellants' federal suit is thus entangled in a "skein of state law." New Orleans Pub. Serv., Inc., 491 U.S. at 361.

The district court recognized the problem:

> As in Marx [v. Snedecker, 612 F. Supp. 1148 (D.N.J. 1985)], analysis of the constitutional questions raised in this case would involve an in-depth analysis of the legislative purposes of AICRA, a major reform effort in an area of law--automobile insurance--that has typically been left to the states to regulate. See Lac D'Amiante du Quebec v. American Home Assurance Co., 864 F.2d 1033, 1038-39 (3d Cir. 1988) ("the states have assumed the primary role in regulating insurance"). This case requires an analysis of whether the challenged regulations, as they apply to chiropractors and their patients, are consistent with the Legislature's attempt in enacting AICRA to reform New Jersey's comprehensive no-fault automobile insurance law so as to reduce the high cost of automobile insurance in New Jersey, or whether chiropractors and their patients have been unfairly singled out for unfavorable treatment. The outcome of this inquiry turns upon an assessment of the rationality of the basis for the regulations, which involves an examination of the administrative procedure and the substantive result of the state regulatory scheme. Unlike in cases where the state regulations under constitutional review were enacted to comply with a federal mandate in the particular regulatory field, see, e.g., New Jersey Hospital Assoc. v. Waldman, 73 F.3d 509 (3d Cir. 1995) (involving a due process challenge to a state agency's reduction in Medicaid reimbursement rates mandated by the Boran Amendments to the Medicaid Act, 42 U.S.C. S 1396(a)(13)(A)), there is no federal interest in the regulation of automobile insurance, an area in which Congress has deferred to the states. See Lac

> D'Amiante, 864 F.2d at 1038-39 (discussing the
> McCarran-Ferguson Act, 15 U.S.C. SS 1011-15, which
> provides for exclusive state regulation of the business
> of insurance).

Dist. Ct. Op. at 20-21, reprinted in App. at 23-24.

III.

That the Appellants have raised federal constitutional
challenges to the regulations does not affect our analysis.
We do not consider the teachings of Bath Mem. Hosp. v.
Maine Health and Fin. Comm'n, 853 F.2d 1007 (1st Cir.
1988), to compel a different result. In that case there was
facial attack on the constitutionality of a statute that
regulated hospital charges. Such an attack is not present
here. Speaking for the court, then-Judge Breyer explained
that the Bath plaintiffs:

> do not seek individualized fact- (or cost-) specific
> regulatory decision making. To the contrary, they
> attack the statute as it is written. Permitting a federal
> court to decide this kind of constitutional claim would
> not interfere with the workings of a lawful state
> system, as such intervention threatened in Burford,
> Alabama P.S.C., or [Allstate Insurance Co. v.] Sabbagh[,
> 603 F.2d 228 (1st Cir. 1979)]. Review here would not
> threaten to create in the federal court a parallel
> regulatory review institution. The risks of interference
> here seem no greater than those present whenever a
> federal court decides whether a state regulatory statute
> is constitutional.

853 F. 2d at 1014-1015.

In contrast with the circumstances in Bath, the
Appellants here do indeed seek individualized fact-specific
regulatory decision making. They do not attack the statute
as written; they attack only discrete portions of regulations
promulgated by the Commissioner, not the legislature, and
review here would certainly create in the federal court a
parallel regulatory review institution. The very factors that
were not present in Bath to militate against applying
Burford are unmistakably present in the case at bar. They
plainly call for the application of abstention here.

14

Our focus should not be on whether a federal claim has been presented, but rather on the nature of that claim. Courts have held almost uniformly, for example, that abstention is inappropriate when a federal plaintiff asserts a preemption/Supremacy Clause claim. See, e.g., New Orleans Pub. Serv., Inc., 491 U.S. at 362-363; Kentucky West Va. Gas Co. v. Pennsylvania Pub. Util. Comm'n , 791 F.2d at 1115-1116; Middle S. Energy, Inc. v. Arkansas Pub. Serv. Comm'n, 772 F.2d 404, 417 (8th Cir. 1985); Baggett v. Department of Professional Regulation, Bd. of Pilot Commissioners, 717 F.2d 521, 524 (11th Cir. 1983); International Bhd. of Elec. Workers, 614 F.2d at 212 n.1. This is because "supremacy clause claims are`essentially one[s] of federal policy,' so that `the federal courts are particularly appropriate bodies for the application of preemption principles.' " Kentucky West Va. Gas Co., 791 F.2d at 1115 (quoting Kennecott Corp. v. Smith, 637 F.2d 181, 185 (3d Cir. 1980)). Additionally, we have held that abstention is inappropriate in cases in which federal courts have exclusive jurisdiction over at least a portion of the claims presented. See Riley, 45 F.3d at 773-774 (federal court had exclusive jurisdiction over plaintiffs' rule 10b-5 securities claims).

The reasoning that supports the exercise of federal question jurisdiction in preemption and exclusive jurisdiction cases is not present here. In this case, Appellants assert that the Commissioner and the Department of Banking and Insurance have overstepped their lawful authority in dealing with a substantial and complex local concern. Appellants' due process attack on the care path regulations requires the same analysis as their state law contentions that the regulations are arbitrary and capricious.2 Federal court review of Appellants' substantive due process argument would thereby create a parallel federal regulatory review institution.

A reviewing federal court would be required to delve

_____

2. Appellants limited their New Jersey court contentions to state law under an appropriate reservation. See England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411 (1964).

15

beyond the text of the regulations in order to adjudicate Appellants' constitutional claims. It would be required to examine the Commissioner's motivations, the Legislature's intent, the overarching goal of a reformed no-fault insurance law and the processes promulgated regarding dispute resolution. These are complex matters of state concern that are currently the subject of the appeals before the Appellate Division. The regulations can, and should, be reviewed by the state court on state law grounds, obviating the need to address constitutional questions. See Burford, 319 U.S. at 333 n.29.

Abstention under Burford is appropriate in this case. The district court properly applied the law and did not exceed the permissible bounds of discretion when it decided to abstain.

The judgment of the district court will be affirmed.

16

STAPLETON, Circuit Judge, dissenting:

The Court today endorses the proposition that " Burford
. . . allows a federal court, in fact urges a federal court, to
decline to exercise jurisdiction when adjudication of
questions of state law (which can only be done by state
courts) may avert the need to delve into constitutional
issues like those presented here." Slip Op. at 7. Specifically,
the Court holds that because plaintiffs "have presented an
`arbitrary and capricious' argument to the [state court],
review by this court . . . would interfere significantly with
New Jersey's efforts to establish and maintain a coherent
automobile insurance regulatory policy." Slip Op. at 12.

I do not understand how adjudication of appellants' due
process and equal protection claims will in any way impair
New Jersey's ability to maintain a coherent policy. More
fundamentally, however, the propositions the Court today
affirms cannot coexist with the well established
propositions that (1) "exhaustion [of state remedies] is not
a prerequisite to an action under S 1983," Patsy v. Board of
Regents, 457 U.S. 496, 501 (1982), (2) "the opportunity to
avoid decision of a constitutional question does not alone
justify abstention by a federal court," Colorado River Water
Conservation Dist. v. United States, 424 U.S. 800, 815 n.21
(1976), (3) "the pendency of an action in the state court is
no bar to proceedings concerning the same matter in the
Federal court having jurisdiction," Colorado River, 424 U.S.
at 817 (quoting McClelland v. Carland, 217 U.S. 268, 282
(1910)), (4) "there is . . . no doctrine requiring abstention
merely because resolution of a federal question may result
in the overturning of state policy," NOPSI v. Council of City
of New Orleans, 491 U.S. 350, 363 (1989) (quoting Zablocki
v. Redhail, 434 U.S. 374, 380 n.5 (1978)), and (5) "Burford
represents an `extraordinary and narrow exception to the
duty of [a federal court] to adjudicate a controversy properly
before it.' " Quackenbush v. Allstate Ins. Co., 517 U.S. 706,
728 (1996). Accordingly, I respectfully dissent.

I.

The plaintiffs in this case are chiropractors and
professional organizations that represent chiropractors both

17

in New Jersey and nationally. They challenge the constitutionality of certain regulations recently promulgated by the New Jersey Department of Banking and Insurance ("DOBI"), pursuant to authority granted in the state's Automobile Insurance Cost Reduction Act ("AICRA"). The New Jersey legislature enacted AICRA in 1998 in an effort to stem the rising cost of private passenger automobile insurance in the state. To further this objective, AICRA calls for DOBI to promulgate standard professional treatment protocols for the diagnosis and treatment of common automobile injuries.

Pursuant to authority granted in AICRA, DOBI has developed regulations which identify six "care paths" associated with back injuries. For each care path, the regulations specify the diagnostic procedures and treatments for which reimbursement will be required from an insurer, without a special showing of medical necessity. Reimbursement for other diagnostic procedures and treatment is required only if they are shown to be medically necessary. The regulations also provide a process for resolving disputes about the medical necessity of care that deviates from or exceeds the degree of care designated in the care paths, culminating in arbitration.

During the period for public comment, the plaintiffs and other health care professionals objected that the "care paths" were "ill-conceived, detrimental to patient care, and dangerous." With few changes to the proposed regulations relevant to the chiropractors' concerns, the final regulations were adopted on November 30, 1998, to become operative on March 22, 1999.

Plaintiffs first filed suit in federal court challenging the constitutionality of the regulations. In their First Amended Complaint, they allege that the regulations violate the plaintiffs' substantive due process, procedural due process, and equal protection rights. In support of their substantive due process claim, plaintiffs assert that "[t]he care paths and arbitration provisions are unreasonable, arbitrary and capricious and do not bear a rational relationship to the legitimate aim of the enabling legislation." App. at 50. In support of their equal protection claim, plaintiffs insist that "there is no rational basis for prohibiting chiropractors from

18

providing reimbursable care to patients under care paths 2, 4, and 6." App. at 51. Finally, in support of their procedural due process claim, the complaint alleges that "the arbitration provisions contained in the . . . regulations . . . deny health care practitioners any practical right to contest the medical treatment judgments of the PIP carriers." App. at 52. Based on these allegations, plaintiffs requested the District Court to declare the regulations dealing with chiropractic care unconstitutional and to enjoin their implementation insofar as they relate to chiropractic care. The plaintiffs' federal complaint is thus limited to claims that the final product of the rule making process (i.e., the regulations) is in conflict with the United States Constitution.1

Shortly after instituting their federal suit, plaintiffs sought judicial review of the regulations under state law from New Jersey Superior Court's Appellate Division. They argued that the DOBI, in promulgating the regulations, exceeded the scope of its authority under AICRA. They also

_____

1. In support of their substantive due process claim, plaintiffs, after asserting that the care paths and arbitration provisions are arbitrary and capricious, allege that "the regulations appear to be targeted at restricting chiropractic care to accident victims, and they manifest a bias
and bad faith towards chiropractors and accident victims who opt to undergo chiropractic care." App. at 50. I read this as further explication of the plaintiffs' facial attack on the regulations. The briefing before us
suggests, however, that plaintiffs may wish to argue that the regulations are invalid because the rule makers were motivated by bias towards chiropractors. While it would not change my view as to the propriety of abstention if I believed the District Court would have to delve into the subjective intent of the rule makers, I know of no authority for the proposition that a substantive due process claim permits a federal court, in a case not involving infringement of a fundamental right, to inquire into the motive behind state legislative or regulatory rule making. Where no fundamental right is implicated, a state law comports with substantive due process and must be upheld if it is rationally related to a legitimate governmental interest. Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 491 (1955); Alexander v. Whitman, 114 F.3d 1392, 1403 (3d Cir. 1997). Midnight Sessions, Ltd. v. City of Philadelphia,
945 F.2d 667 (3d Cir. 1991), relied upon by the plaintiffs, dealt with a challenge to a refusal to issue a dance hall license, not with a challenge to rule making.

19

attacked the process by which the regulations were developed, arguing, inter alia, that they "were adopted without appropriate consultation with national and state standard setting organizations or the applicable state professional licensing boards." App. at 86. Consistent with England v. Louisiana State Bd. of Med. Exam'rs, 375 U.S. 411 (1964), plaintiffs expressly "reserve[d] their right to pursue federal claims in a previously filed federal court action." App. at 86.

The District Court abstained on the basis of Burford v. Sun Oil Co., 319 U.S. 315 (1943). Plaintiffs ask that we reverse the dismissal of their federal suit and remand this matter to the District Court for further proceedings, including consideration of their application for a preliminary injunction. The DOBI asks that we affirm based on Burford, or, alternatively, on the Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496 (1941), Younger v. Harris, 401 U.S. 37 (1971), or Colorado River, 424 U.S. 800, abstention doctrines. I would grant the relief that plaintiffs seek.

II.

Because the District Court dismissed plaintiffs' complaint, we must take their allegations to be true. See Monaghan v. Deakins, 798 F.2d 632 (3d Cir.1986), aff'd in part and vacated in part, 484 U.S. 193 (1988). In reviewing a District Court's decision to abstain, the underlying legal questions are subject to plenary review, although the decision to abstain is reviewed for abuse of discretion. "The determination of whether this case falls in the area within which the district court may exercise discretion is therefore a matter of law, reviewable on a plenary basis. Only if we determine that the case falls within this range will we apply an abuse of discretion standard in reviewing the district court's decision to abstain." University of Md. v. Peat Marwick Main & Co., 923 F.2d 265, 270 (3d Cir. 1991).

III.

I begin with the Supreme Court's admonition that abstention is the "exception and not the rule" and that a

20

federal court's obligation to adjudicate claims within its jurisdiction is "virtually unflagging." University of Md., 923 F.2d at 271, (quoting NOPSI, 491 U.S. at 359). As the Supreme Court recently reiterated, federal courts

> have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution. [T]he courts of the United States are bound to proceed to judgment and to afford redress to suitors before them in every case to which their jurisdiction extends. They cannot abdicate their authority or duty in any case in favor of another jurisdiction. When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction. . . . The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied.

NOPSI, 491 U.S. at 358-59 (quotations and citations omitted).

A District Court may abstain in a case in which it has jurisdiction only if that case falls within one of the four, very narrow, exceptions articulated in Burford, Pullman, Younger, and Colorado River. To preserve the general rule, courts have delineated the contours of these limited exceptions and provided specific elements for each. I believe that the majority's approach unnecessarily blurs the lines dividing the exceptions -- most notably between the Burford and Pullman exceptions -- and thereby establishes a precedent that takes a substantial step toward creating the proverbial "exception that swallowed the rule." I believe that fidelity to the general rule obliging federal courts to exercise their jurisdiction requires a careful analysis of each doctrine's applicability. That analysis leads me to conclude that none of the abstention exceptions are applicable here.

IV.

The Supreme Court has summarized the Burford doctrine as follows:

> Where timely and adequate state court review is available, a federal court sitting in equity must decline

21

to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case at bar"; or (2) where "the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

NOPSI, 491 U.S. at 361.

I agree with my colleagues that timely and adequate state court review has been available to plaintiffs. They have no duty to exhaust their state remedies before pressing forward with their S 1983 claims in the federal court, however, and this is true even though such exhaustion might relieve a federal court of the burden of resolving a constitutional issue in the S 1983 case. See Patsy, 457 U.S. at 515; Hawaii Housing Auth. v. Midkiff, 467 U.S. 229, 236–37 (1984); Marks v. Stinson, 19 F.3d 873, 882 (3d Cir. 1994).

The District Court found, and appellees contend, that abstention was appropriate here under the second prong of the Burford doctrine -- i.e., because federal review would disrupt state efforts to establish a coherent policy on a matter of substantial public concern.

There is no dispute in this case that the legislative scheme reflected in AICRA and the implementing regulations constitutes a complex regulatory scheme covering a subject matter in which the state has very important interests. It is also indisputable that a federal court declaration in this case that these regulations violate the federal constitution and an injunction preventing their implementation would disrupt this state regulatory scheme. These undisputed facts do not alone make Burford abstention appropriate, however. "While Burford is concerned with protecting state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process . . . ." NOPSI, 491 U.S. at 362. And "there is, of course, no doctrine requiring abstention merely because resolution of

22

a federal question may result in the overturning of a state policy." Zablocki, 434 U.S. at 379-80 n.5.

Burford is thus not directed to the disruption that comes from a one-time federal declaration that a state program is unconstitutional. As the above quoted portion of NOPSI indicates, it is concerned rather with cases in which a federal court will be called upon to resolve issues involving policy judgments that should be reserved for state officials who gain special competence from administering and developing the regulatory process. As then judge, now Justice Breyer explained in a very similar context in Bath Mem. Hosp. v. Maine Health and Fin. Comm'n, 853 F.2d 1007 (1st Cir. 1988), the threat to which Burford is directed is an "institutional" one:

> Federal courts abstained in Burford, and in similar cases, such as [Alabama Public Serv. Comm'n v. S. Ry. Co., 341 U.S. 341 (1951)] and [Allstate Ins. Co. v. Sabbagh, 603 F.2d 228 (1st Cir. 1979)] when they feared that excessive federal court intervention unnecessarily threatened to impede significantly the ongoing administration of a state regulatory system. The threatened interference did not consist merely of the threat that the federal court might declare the entire state system unconstitutional; that sort of risk is present whenever one attacks a state law on constitutional grounds in a federal court. Rather, in our view, abstention in the Burford line of cases rested upon the threat to the proper administration of a constitutional state regulatory system. The threat was that the federal court might, in the context of the state regulatory scheme, create a parallel, additional, federal, `regulatory review' mechanism, the existence of which would significantly increase the difficulty of administering the state regulatory scheme. It was this special and unusual "institutional threat" that, in our view, led the federal courts to abstain.

> To be more specific, in Burford, the plaintiff, invoking diversity jurisdiction, asked a federal court to decide that, as a matter of state law, it was entitled to a state oil permit that would have given it a right to remove oil through its wells from a field where large numbers of

23

other producers also had wells. A state agency, the Texas Railroad Commission, was in charge of deciding just who could withdraw what oil from a commonly drilled field, a highly technical question, and one of great local importance, for the Texas Railroad Commission, through this regulation, sought to impose restrictions on supply that would keep interstate oil prices high. . . . Because of the need, in terms of both economics and equity, to achieve a consistent set of decisions (and the fact that changing economic conditions could require rapidly changing decisions) the state statute had centralized all judicial review in a single Texas state court. As the Supreme Court pointed out, in these circumstances, the presence of a federal court as an independent forum of review for individual licensing decisions based on a balancing of factually-based local interests created a risk of inconsistency (between diversity cases and others) that could have threatened the viability of the Texas regulatory scheme.

Bath, 853 F.2d at 1013-14 (citations omitted) (emphasis in original).

Here, as in Bath, the "plaintiffs do not seek individualized review of fact . . . specific regulatory decision making. To the contrary, they attack the [regulations] as [they are] written. . . . Review here would not threaten to create in the federal court a parallel regulatory review institution. The risks of interference here seem no greater than those present whenever a federal court decides whether a state regulatory statute is constitutional." Id. at 1014-15.

If we were to allow the District Court to proceed in this matter, it would be called upon, insofar as the substantive due process and equal protection claims are concerned, to do nothing more (and nothing less) than look at the text of the regulation and ask whether a rational rule maker could possibly conclude that the challenged provisions would in some way serve the legitimate governmental interest identified by the state in response to the challenge. See United States v. Williams, 124 F.3d 411, 422 (3d Cir. 1997) (equal protection); Alexander, 114 F.3d at 1406 (substantive due process). This extremely deferential rational basis review is deliberately designed to constrain a federal court

24

from resolving an issue of state policy -- if the court can conceive of any rational basis for the policy choice made in the challenged regulatory provision there is no constitutional violation and the case is over.

With respect to plaintiffs' procedural due process claim, the District Court would be called upon to determine whether the arbitration process provides a fair opportunity for health care practitioners to contest the medical treatment judgments of the PIP carrier. Again, this would involve examining facially the procedure provided to determine whether it comports with the minimum procedural due process required by the Fourteenth Amendment. See Mathews v. Eldridge, 424 U.S. 319, 325 (1976). I fail to see how performing this task will in any way "be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." NOPSI, 491 U.S. at 361.

While the claims in this case and the state proceeding are distinct, they do deal with the same subject matter and it is conceivable that the Appellate Division may consider arguments and issues similar to those that will be involved here. We have clearly held, however, that parallel proceedings dealing with the same subject matter are not a basis for abstention. Marks, 19 F.3d at 881. Burford is implicated only when there are issues that the federal court would have to resolve in the federal proceeding that should be reserved for a state tribunal having special competence to resolve them. The issues here are conventional challenges based on the federal constitution, and the Appellate Division, while as competent, is no more competent than the District Court to resolve those issues.2

_____

2. The Court distinguishes the closely analogous Bath case on the ground that plaintiffs here "attack [on due process and equal protection grounds] only discrete portions of regulations promulgated by the Commissioner, not the legislature." Slip Op. at 14. It fails to explain, however, how adjudication of the constitutional issues here posed to the District Court would be any more disruptive of the state's ability to develop coherent policy than adjudication of the issues presented to the federal court in Bath.

25

V.

In Artway v. Attorney Gen. of N.J., 81 F.3d 1235 (3d Cir. 1996), we explained Pullman abstention as follows:

> Under our jurisprudence, a district court must make three findings in order to justify the Pullman exception to the general rule that federal courts must hear cases properly brought within their jurisdiction. The Court must find (1) that uncertain issues of state law underlie the federal constitutional claims brought in the district court; (2) that the state law issues are amenable to a state court interpretation that would obviate the need for, or substantially narrow, adjudication of the federal claim; and (3) that important state policies would be disrupted through a federal court's erroneous construction of state law. If all three factors are present, the federal court must then consider whether abstention is appropriate by weighing such factors as the availability of an adequate state remedy, the length of time the litigation has been pending, and the impact of delay on the litigants.

Artway, 81 F.3d at 1270 (citations omitted) (emphasis added).

Thus, Pullman abstention is applicable only in the narrow category of cases in which a federal court will have to determine an uncertain issue of state law in the course of reaching a federal constitutional issue and important state policies would be frustrated should the federal court err in deciding that issue. While DOBI repeats many times in its brief that the federal court here would have to interpret the statute and the regulations, it has not identified a single specific issue of state law that is both unclear and relevant to the issues the federal court has been asked to address. Pullman abstention, accordingly, would be inappropriate here.

Were it true, as the Court suggests, that Burford allows a federal court to decline to exercise jurisdiction whenever a state court's decision might "avert the need to delve into constitutional issues," slip op. at 7, Pullman abstention would serve no purpose. One would never need to ask whether there are unclear questions of state law, the

26

resolution of which would be material to the constitutional issues presented in the federal proceeding. Burford abstention would be appropriate even in the absence of such issues.

VI.

In Frank Russell Co. v. Wellington Mgmt., 154 F.3d 97, 106 (3d Cir. 1998), we summarized Younger as "prohibit[ing]" a "federal court from enjoining an on-going state action" if "(1) there is an on-going state judicial proceeding; (2) the state proceeding implicates an important state interest, and (3) the state proceeding provides an adequate opportunity to raise the constitutional issue." As we said in Marks, however, "while a proponent of abstention must show [these three circumstances exist], such a showing does not require that the federal court abstain." Marks, 19 F.3d at 882 (emphasis supplied).

The teachings of Marks are helpful here. First, Marks explains that the key to Younger abstention is not the presence of parallel state proceedings, but rather the likelihood that the federal action will interfere with the ongoing state proceedings. "This is true even in cases where there exists a `potential for conflict in the results of adjudications.' " Id. at 882 (quoting Colorado River, 424 U.S. at 816). After all, as Marks reminds, "[a] federal plaintiff may pursue parallel actions in the state and federal courts so long as the plaintiff does not seek relief in the federal court that would interfere with the state judicial process." Id. at 885.

Even though the plaintiffs in Marks sought injunctive relief from the federal court, abstention under Younger was not justified. As we explained,

> [Marks was] not a case in which the federal plaintiffs are seeking relief which will in any way impair the ability of the state courts of Pennsylvania to adjudicate anything that is currently before them. When [Marks'] suit was filed, plaintiffs . . . had instituted two proceedings challenging the election, both of which were then before the Court of Common Pleas. The federal suit did not directly or indirectly ask the court

27

> for any relief with respect to those state proceedings. The plaintiffs were simply pursuing parallel tracks seeking consistent relief in the federal and state systems.

Id. at 884. The same is true here. Plaintiffs do not seek to enjoin a state judicial proceeding or to enjoin enforcement of a state judicial decree. Younger abstention would thus violate the District Court's duty to resolve federal claims.

VII.

The "threshold inquiry that must be decided in any Colorado River abstention case is whether the two actions are `parallel.' " Ryan v. Johnson, 115 F.3d 193, 196 (3d Cir. 1997). If they are not, the District Court lacks the power to abstain. "Generally, cases are parallel when they involve the same parties and claims." As we explained in Trent v. Dial Med. of Fla., Inc., "it is important that only truly duplicative proceedings be avoided. When the claims, parties or requested relief differ, deference may not be appropriate." Trent, 33 F.3d 217, 224 (3d Cir. 1994) (quoting Complaint of Bankers Trust Co. v. Chatterjie, 636 F.2d 37, 40 (3d Cir. 1980)).

The state and federal proceedings here are not parallel. As I have explained, the state proceeding involves only state law challenges to the regulations, while the federal proceeding involves only federal constitutional issues. As a result, Colorado River abstention is inapposite here.

VIII.

The District Court had an obligation to entertain and resolve plaintiffs' constitutional claims. It lacked authority to abstain. Accordingly, I would reverse its order of dismissal and remand this case for proceedings, including prompt consideration of plaintiffs' application for a preliminary injunction.

28

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

29